MOSIER v. CARNEY.

SMITH v. KING.

DOOD v. MOSHER.

DECISION OF THE COURT.

1. HUSBAND AND WIFE—INTERSPOUSAL IMMUNITY FROM TORT.
   Judgments in actions between spouses, or the legal representatives of their estates, in which recovery was denied plaintiff because of interspousal immunity from tort are reversed and remanded for further proceedings.

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 5, 6] 27 Am Jur, Husband and Wife § 589.
[3] 38 Am Jur, Negligence § 2.
[4] 17 Am Jur, Divorce and Separation § 560.
[7] 27 Am Jur, Husband and Wife § 602.
[8] 27 Am Jur, Husband and Wife § 584.
   22 Am Jur 2d, Death §§ 73, 80.
[9] 53 Am Jur, Trial § 573.
[10] 22 Am Jur 2d, Death §§ 73, 80.
[11, 19, 27] 27 Am Jur, Husband and Wife §§ 589, 594.
[12] 22 Am Jur 2d, Death § 6.
[13] 22 Am Jur 2d, Death § 13.
[14, 15] 22 Am Jur 2d, Death §§ 73, 80.
[16, 37, 48] 5 Am Jur 2d, Appeal and Error § 1009.
[17] 22 Am Jur 2d, Death §§ 73, 80.
[18] 22 Am Jur 2d, Death § 74.
   Liability of parent or person in loco parentis for personal tort against minor child. 19 ALR2d 423.
[20] 20 Am Jur 2d, Courts § 67.
[21, 23, 26, 32, 33] 27 Am Jur, Husband and Wife §§ 589, 593.
[22, 24] 50 Am Jur, Statutes §§ 344–346.
[25] 22 Am Jur 2d, Death §§ 73, 80.
   27 Am Jur, Husband and Wife § 589.
[28] 20 Am Jur 2d, Courts § 198.
   50 Am Jur, Statutes § 45.
[29] 22 Am Jur 2d, Death § 80.
[30, 31] 20 Am Jur 2d, Courts §§ 186, 231, 232.

SEPARATE OPINION.

T. M. KAVANAGH, C. J., and DETHMERS, SOURIS, and ADAMS, JJ.

2. HUSBAND AND WIFE—INTERSPOUSAL TORT IMMUNITY.

   *The doctrine of interspousal tort immunity is a creation of the common law, not codified in this State, and should be changed to avoid continuing injustice.*

3. NEGLIGENCE—DEFINITION.

   *Negligence is basically a question of reasonable behavior in the circumstances.*

4. HUSBAND AND WIFE—TORTS—COMPENSATION—ALIMONY.

   *Alimony is a device whereby a spouse is obliged to discharge an obligation of support, and not a means of recompensing one spouse for tortious injuries endured during marriage.*

5. SAME—INTERSPOUSAL TORT IMMUNITY—DIVORCE—CRIMINAL LAW.

   *The doctrine of interspousal tort immunity is incongruous with the right of a spouse to divorce or to subject the mate to criminal prosecution for torts committed during the marriage, which are disruptive of the marital relation.*

6. SAME—INTERSPOUSAL TORT IMMUNITY—COLLUSION.

   *Abolition of the doctrine of interspousal tort immunity should not be delayed because its abolition would increase the possibility of collusion, since skillful cross-examination and perceptivity of triers of fact make success of collusion unlikely.*

7. SAME—COMMON LAW—DISABILITY TO MAINTAIN A SUIT BY MARRIED WOMAN.

   *The judicially created personal disability of a married woman to maintain a suit in her own name at common law does not support the proposition that she has no legal existence during coverture.*

---

REFERENCES FOR POINTS IN HEADNOTES

[34] 50 Am Jur, Statutes §§ 223, 224.
[35] 22 Am Jur 2d, Death § 80.
[36] 20 Am Jur 2d, Courts §§ 198, 233, 234.
[38] 22 Am Jur 2d, Death §§ 73, 80.
[39] 20 Am Jur 2d, Courts § 198.
[40, 46] 20 Am Jur 2d, Courts § 183.
[41, 42] 20 Am Jur, Evidence § 211.
[43] 20 Am Jur 2d, Courts § 233.
   Comment Note.—Right of court in overruling earlier precedent to apply new rule prospectively and adhere to old one as regards past transactions. 85 ALR 262.
[44, 47] 22 Am Jur 2d, Death § 80.
[45] 22 Am Jur 2d, Death § 73.

8. SAME—INTERSPOUSAL TORT IMMUNITY—COLLUSION—DISRUPTION OF MARITAL RELATION.

The doctrine of interspousal tort immunity, exemplified in Bandfield v. Bandfield, 117 Mich 80; Harvey v. Harvey, 239 Mich 142; Riser v. Riser, 240 Mich 402; and Kircher v. Kircher, 288 Mich 669, is not followed in cases where one of the spouses is deceased, since there is then no possibility of collusion, nor in action for personal injuries inflicted prior to marriage, since there is no disruption of the marital relation, collusion and disruption heretofore having been assigned as reasons for pursuing such doctrine.

9. COURTS—FACTS.

Cases must be decided on the facts presented, not abstractions.

10. HUSBAND AND WIFE—TORTS—COLLUSION—DEATH.

An action for personal injuries may be maintained by one spouse against the estate of the other spouse for the gross negligence of the latter, where the circumstances giving rise to the cause of action have terminated the marriage by death, there no longer being any possibility of interspousal collusion, hence, public policy presents no bar.

11. SAME—ANTENUPTIAL TORT—COLLUSION.

Public policy does not require that an action based on alleged negligence of the defendant be dismissed merely because after the action was commenced, the parties chose to marry each other, adversary proceedings and detection by triers of fact being a sufficient protection against collusion or other improper conduct (CL 1948, § 750.422).

12. DEATH—CONSTRUCTION OF STATUTES.

The death act is a remedial statute and is to be liberally construed since it was intended to remedy unconscionable results reached in litigation under the common law whereby it was financially less burdensome to tort-feasors to kill than merely to maim their victims (CL 1948, §§ 691.581–691.583).

13. SAME—NEW ACTION.

One suing under the wrongful death act is not suing upon a right accruing to the decedent but rather upon a new cause of action specifically created as a remedy for those who suffer loss because of decedent's death (CL 1948, §§ 691.581–691.583).

14. SAME—PERSONAL IMMUNITY OF DECEDENT.

Those injured by the death of person who was killed by the wrongful act of defendant are not barred from recovery from

*defendant under the death act because a purely personal immunity of the deceased might have barred suit by the deceased (CL 1948, §§ 691.581–691.583).*

15. SAME—PURPOSES OF DEATH ACT.

*The purpose of the wrongful death act was to impose liability in case the death of a person was by the wrongful act of another, hence, where one spouse has fatally injured the other spouse, the personal representative of the latter would not be barred by reason of the fact that deceased had been married to the defendant (CL 1948, §§ 691.581–691.583).*

16. COSTS—PUBLIC QUESTION—INTERSPOUSAL TORT IMMUNITY.

*No costs are allowed in 3 cases, wherein the doctrine of interspousal tort immunity has been materially limited in application, a question of public importance being involved.*

SEPARATE OPINION.

SMITH, J.

17. HUSBAND AND WIFE—INTERSPOUSAL TORT IMMUNITY—DEATH—EVIDENCE.

*Abrogation of interspousal tort immunity in this State is effective to permit wife to sue estate of deceased husband for injuries received as a result of his alleged wilful and wanton misconduct in driving on a long trip without proper rest, failing to heed warnings, refusal of assistance, and driving car at a dangerous and unlawful speed, proving such conduct and recovering damages, there being no marriage now to defend.*

18. SAME—DEATH—INTERSPOUSAL TORT IMMUNITY—RECOVERY FOR CHILDREN.

*Abrogation of interspousal tort immunity in this State is effective to permit personal representatives of estate of mother to sue father for wrongful death of mother so as to recover damages on behalf of children only for the loss of their mother allegedly caused by gross negligence of the father and concurring negligence of another driver.*

19. SAME—INTERSPOUSAL TORT IMMUNITY—PREMARITAL TORT.

*Abrogation of interspousal tort immunity in this State is effective to permit plaintiff husband to sue defendant wife for tortious injury sustained by him prior to their marriage, the fact finder's scrutiny being sufficient to protect against collusion by persons having substantial identity of economic interest.*

20. COURTS—DECISIONS.
*Courts must render judgments between parties when the latter call upon the courts for such purpose and the matter is within the court's jurisdictional competence.*

DISSENTING OPINION.

KELLY, J.

21. HUSBAND AND WIFE—STATUTES—INTERSPOUSAL TORT ACTION.
*Statutes and amendments thereto, pertaining to actions by and against married women, enacted during a period of more than a century have not accorded her the right to sue her husband for recovery of damages for injury resulting to her from an interspousal negligent tort (CL 1948, § 557.1 et seq.; § 612.6; CLS 1961, § 600.2001).*

22. STATUTES—COMMON LAW.
*The legislature is presumed to have had the common law in mind when it enacts a statute in derogation of the common law, hence, the statute will be read along with the provisions of the common law.*

23. HUSBAND AND WIFE—WIFE'S TORT ACTION AGAINST HUSBAND.
*Statute providing that a married woman may sue or be sued "whenever a cause of action shall accrue to, or arise against" her did not enable her to maintain an action in tort against her husband for injuries she received by his negligence, since no such action accrued to her at common law (CL 1948, § 612.6).*

24. SAME—STATUTES—INTERSPOUSAL TORT IMMUNITY.
*Revised judicature act provision that "actions may be brought by and against a married woman, as if she were unmarried," rephrasing prior provisions, did not change the previous immunity doctrine, and, since it was not given retroactive effect, could not apply to 3 claimed torts occurring before the revised act ·became effective (CL 1948, § 612.6; CLS 1961, § 600-.2001).*

25. SAME—STATUTES—COMMON LAW—NEGLIGENCE.
*Neither statutes nor the common law justify an action by the wife, or the administrator of her estate, against her husband, or the administratrix of his estate, for recovery of damages for injuries she had sustained due to his negligence (CL 1948, § 557.1 et seq.; § 612.6; CLS 1961, § 600.2001).*

26. SAME—COMMON LAW—ABROGATION OF INTERSPOUSAL IMMUNITY.
   *Abrogation of the common-law rule of interspousal immunity from recovery for tort should better be left to the legislature's determination because of the many ramifications involved, such as insurance and collusion, conceding the Supreme Court had the right to change such common-law rule in order to avoid continuing injustice.*

27. SAME—COMMON LAW—ANTENUPTIAL TORTS.
   *Neither husband nor wife could, at common law, sue the other for injuries due to torts committed before or during their marriage.*

28. DEATH—INTERSPOUSAL TORT IMMUNITY—LEGISLATURE—COURTS.
   *Legislative error in overlooking interspousal tort immunity provision in enacting the wrongful death act is a matter for correction by the legislature, not the Supreme Court by way of elimination of the error through a liberal construction (CL 1948, §§ 691.581, 691.582).*

29. SAME—INTERSPOUSAL TORT IMMUNITY.
   *The wrongful death act presupposes ability on the part of the deceased to have maintained an action and thereby indicates a legislative intent not to abrogate the common-law rule of interspousal immunity from liability for tort (CL 1948, §§ 691.581, 691.582).*

DISSENTING OPINION.

BLACK, J.

30. COURTS—PRECEDENTS—OVERRULING.
   *A precedent involving the construction of a long-standing statute should not be overruled merely because adherence thereto may not be pleasing, especially where it amounts to judicial amendment of an otherwise unamended statute, since to do so would constitute an outright usurpation of all lawmaking power (Const 1963, art 3, § 2).*

31. SAME—OVERRULING OF A PRECEDENT.
   *A precedent, especially one involving the interpretation of a long-standing statute, should be overruled, if at all, explicitly and prospectively.*

32. HUSBAND AND WIFE—CONSTRUCTION OF STATUTES.
   *The legislature has accepted various unanimous and long-standing decisions interpreting provisions of statutes relating to married*

*women as not permitting the maintenance of interspousal tort actions (CL 1948, §§ 612.5, 612.6).*

33. Same—Interspousal Tort—Defense of Husband Preserved.

*The accrued right of a husband to defend an action for negligent injuries he inflicted upon his wife prior to the effective date of the revised judicature act has been expressly preserved by statute (CL 1948, §§ 612.5, 612.6; CLS 1961, §§ 600.2001, 600.9905).*

34. Statutes—Intent.

*Legislative intent is determinable properly by what was at the time of enactment rather than what might appear at a much later time by hindsight.*

35. Death—Wife's Action for Husband's Negligence.

*The wrongful death act presupposes ability on the part of the deceased to have maintained an action if death had not ensued and conferred no right of action upon the administrator of the estate of a wife to sue for negligent injuries which her husband inflicted upon her (CL 1948, §§ 612.5, 612.6, 691.581).*

36. Statutes—Amendment—Courts.

*Statutes should not be amended by judicial order, especially not by nunc pro tunc amendment.*

37. Costs—Interspousal Tort Immunity.

*No costs are allowed in 3 cases, wherein the doctrine of interspousal tort immunity has been involved.*

38. Death—Interspousal Tort Immunity.

*The wrongful death statute, as it stood before adoption of the revised judicature act, did not create an exception to the normal immunity from suit between husband and wife (CL 1948, § 691.581).*

39. Statutes—Legislative Acquiescence in Construction.

*The doctrine that the legislature has acquiesced in the Supreme Court's construction of a statute by reason of not making any change in the statute over a long period of time should apply irrespective of which class of persons may have been favored by the interpretation.*

40. Courts—Common Law—Stare Decisis—Construction of Statutes.

*The Supreme Court's primary duty is that of reporting precedentially, for the guidance of the people of the State, the common law of the State, and of ascertaining precedentially the legisla-*

*tively intended meanings of statutes enacted by the legislature,*
*a purpose that is not effected when a long-standing interpreta-*
*tion of a statute or common-law rule is overturned.*

41. COMMON LAW—MAXIMS—PRESUMPTIONS.
*Everyone is presumed to know the law, and ignorance of the law*
*is not listened to as an excuse at court.*

42. SAME—MAXIMS.
*It is vital to continuity of the great experiment of government*
*by law and justice under law that the law be stable, and*
*that there be common understanding of the law as written,*
*since citizens are required to observe, learn, and conform*
*thereto.*

43. COURTS—OVERRULED PRECEDENTS.
*The overruling of a long-standing judicial construction of a*
*statute should not be given retroactive effect.*

SEPARATE OPINION BY O'HARA, J., DISSENTING IN PART.

44. HUSBAND AND WIFE—TORTS—AUTOMOBILES.
*A suit may be maintained, predicated upon injuries to one spouse*
*during marriage arising out of an alleged wrongful act of the*
*marital partner when the allegedly wrongful act resulted in*
*the termination of the marriage by death, but only when the*
*wrongful act alleged is the negligent operation of the family*
*automobile.*

45. DEATH—ACCRUAL OF ACTION TO ADMINISTRATOR.
*The fact that a wife, now deceased, could not have asserted*
*her cause of action if death had not ensued would not pre-*
*clude the administrator of her estate from asserting an action*
*under the death act since the bar to asserting the cause of*
*action was peculiar to the wife and not to the accrual of*
*the cause of action itself (CL 1948, § 691.581).*

46. COURTS—OVERRULING PRECEDENTS.
*Courts must weigh the merits and demerits of the matter of*
*overruling of long-standing common-law precedents.*

47. SAME—ABROGATION OF INTERSPOUSAL TORT IMMUNITY—DEATH—
AUTOMOBILES.
*Doctrine of interspousal tort immunity from liability is abrogated*
*as to instant, pending, and future cases arising from negligent*
*operation of family automobiles and in which the marital re-*
*lation is terminated by death.*

48. Costs—Interspousal Tort Immunity.
    *No costs are allowed in 3 cases, wherein the doctrine of interspousal tort immunity is materially limited in application.*

Mosier *v.* Carney:

Appeal from Genesee; Parker (Donn D.), J. Submitted January 9, 1964. (Calendar No. 11, Docket No. 50,142.) Decided December 7, 1965.

Case by Charles B. Mosier, administrator of the estate of Maxine Symons Carney, deceased, against Admiral Equell Carney, surviving spouse of the deceased, and John Akers under the death act for damages arising from collision of automobiles August 22, 1958. Motion to dismiss as to defendant Carney granted. Plaintiff appeals. Reversed and remanded for further proceedings.

*Leitson, Dean, Dean & Abram (Robert M. Abram,* of counsel), for plaintiff.

*Morrissey, Bove & Yeotis (John P. Bove,* of counsel), for defendant Carney.

———

Smith *v.* King:

Appeal from Oakland; Dondero (Stanton G.), J. Submitted May 6, 1964. (Calendar No. 56, Docket No. 50,360.) Decided December 7, 1965.

Case by Mamie Solomon Smith against Willa Mae King, administratrix of the estate of John P. Smith, deceased, for personal injuries sustained while a passenger in automobile of deceased spouse involved in a one-car accident July 4, 1960, in the State of California. Action dismissed on motion.

Plaintiff appeals.  Reversed and remanded for further proceedings.

*Adams & Wade* (*William E. Wade,* of counsel), for plaintiff.

*Howlett, Hartman & Beier,* for defendant.

---

DOOD *v.* MOSHER:

Appeal from Kent; Hoffius (Stuart), J.  Submitted January 7, 1965.  (Calendar No. 52, Docket No. 50,410.)  Decided December 7, 1965.

Complaint by Bernard Dood against Dorothy Mosher for personal injuries sustained May 16, 1962, when he stepped on rusty nail on defendant's premises while a boarder at her home.  Following commencement of suit parties were married.  On motion, summary judgment entered in favor of defendant. Plaintiff appeals.  Reversed and remanded for further proceedings

*Hayes & Davis* (*Kenneth T. Hayes,* of counsel), for plaintiff.

*Luyendyk, Hainer, Hillman, Karr & Dutcher* (*Richard B. Baxter* and *Robert N. Hammond,* of counsel), for defendant.

---

ALL THREE CASES:

Opinions entered applicable to all three cases. Each case reversed and remanded for further proceedings.

*Amici Curiae:*

Negligence Law Section, State Bar of Michigan (*Richard S. Miller,* of counsel), advocating that the doctrine which prevents husband and wife from suing one another to recover damages for personal injuries inflicted by the other be overruled, retroactively.

Negligence Law Section, State Bar of Michigan (*Altaro J. Alteri,* of counsel), advocating that no change in the rule of interspousal immunity be made.

SOURIS, J. (*for reversal*). Four times in the published reports of this Court we have directly or indirectly denied the right of one spouse to sue the other for recovery of damages for injuries resulting from an interspousal negligent tort.[1] We said that at common law such a suit could not be maintained, and we found no statute which we thought would authorize such a suit. That the time has come for a reconsideration of this area of the law is indicated by the fact that we now are called upon to decide these three cases, each originating in a different circuit court and each involving the successful assertion of the doctrine of interspousal tort immunity as a defense. In view of the importance of the legal principles involved, we requested the negligence law section of the State bar association to submit a brief amicus. Indicative of the present ambivalence of thought upon this question is the fact that two briefs were in fact submitted by the bar, one advocating and the other opposing the repudiation of the defensive doctrine of interspousal tort immunity. We acknowledge their assistance in our resolution

---

[1] *Bandfield* v. *Bandfield* (1898), 117 Mich 80 (40 LRA 757, 72 Am St Rep 550); *Harvey* v. *Harvey* (1927), 239 Mich 142; *Riser* v. *Riser* (1927), 240 Mich 402 (27 NCCA 518); and *Kircher* v. *Kircher* (1939), 288 Mich 669 (7 NCCA NS 72).

of the issue as presented by the three cases before us for decision.

At the outset we note that the felt need for re-examination of the common law defense of interspousal tort immunity has not been confined to Michigan. Indeed, at least 32 jurisdictions either have completely, or at least in certain fact situations, abolished the defense. A sampling of such cases is collected in the appendix which follows this opinion. We note also that the common-law doctrine has received virtually universal excoriation from the legal scholars who have given consideration to it. See the selective bibliography included in the appendix.

While most of the cases cited in the appendix which have rejected the common-law doctrine purport to base their holdings upon so-called married women's acts, it is evident from many of the opinions that the courts had concluded that the immunity defense no longer had any valid basis in logic, fact, or policy. The fact that virtually the same statutory language is subject to varying interpretations by these courts suggests strongly that the actual basis for many of their decisions is a reappraisal of the common law and its rejection because no longer applicable to the facts of modern civilization.

We shall pursue a more forthright course in our disposition of the cases at bar. Since the doctrine of interspousal tort immunity is a creation of the common law and since such doctrine has never been codified in this State, it is our duty to re-examine it and, if necessary to avoid continuing injustice, to change it.[2] We shall analyze our four pertinent precedents and, in our effort to understand them, we

[2] Article 3, § 7, Constitution of 1963: "The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed." See Schedule, § 1 of the Constitution of 1908 for the predecessor of the foregoing.

shall examine in the process other earlier decisions
of our own and other courts. "To the reader my
advice is, that in reading of these or any new reports,
he neglect not in any case the reading of the old
books of years reported in former ages, for assuredly
out of the old fields must spring and grow the new
corn."[3]

## I.

In *Bandfield* v. *Bandfield* (1898), 117 Mich 80 (40
LRA 757, 72 Am St Rep 550), the first of our four
precedents, plaintiff married defendant in 1879, ob-
taining a divorce from him in 1897. Thereafter she
began suit to recover damages from defendant for
infecting her with a venereal disease in 1893. In
affirming dismissal of her suit on demurrer, this
Court briefly considered and rejected as inapplicable
the legislature's modifications of the legal conse-
quences of the marital relation as embodied in the
married women's acts.

The Court based its decision upon the following
expressed considerations:

"The result of plaintiff's contention would be an-
other step to destroy the sacred relation of man and
wife, and to open the door to lawsuits between them
for every real and fancied wrong,—suits which the
common law has refused on the ground of public
policy. This Court has gone no further than to sup-
port the wife, under the married woman's act, in
protecting her in the management and control of
her property. It has sustained her right to an action
for assault and battery, for slander, and for aliena-
tion of her husband's affections against others than
her husband. *Berger* v. *Jacobs,* 21 Mich 215;
*Leonard* v. *Pope,* 27 Mich 145; *Rice* v. *Rice,* 104 Mich
371. At the same time, it has held that the wife

---

[3] Preface to the First Part of the Reports of Sir Edward Coke
(Browne's Eng ed in 13 parts), pp 1727–1738; (seven volumes).

could not enter into a partnership or other business with her husband, and thus become responsible for the contracts and debts of her husband. *Artman* v. *Ferguson,* 73 Mich 146 (2 LRA 343, 16 Am St Rep 572); *Edwards* v. *McEnhill,* 51 Mich 160. Personal wrongs inflicted upon her give her the right to a decree of separation or divorce from her husband, and our statutes have given the court of chancery exclusive jurisdiction over that subject. This court, clothed with the broad powers of equity, can do justice to her for the wrongs of her husband, so far as courts can do justice, and, in providing for her, will give her such amount of her husband's property as the circumstances of both will justify, and, in so doing, may take into account the cruel and outrageous conduct inflicted upon her by him, and its effect upon her health and ability to labor. 2 Am & Eng Enc Law (2d ed), 120; How Stat § 6245. In the absence of an express statute, there is no right to maintain an action at law for such wrong. We are cited to no authority holding the contrary. We cite a few sustaining the rule: *Abbott* v. *Abbott,* 67 Me 304 (24 Am Rep 27); *Freethy* v. *Freethy,* 42 Barb (NY) 641; *Peters* v. *Peters,* 42 Iowa 182; *Schultz* v. *Schultz,* 89 NY 644; Cooley, Torts, p 228; Schouler, Domestic Relations (4th ed), § 52; Newell, Defamation, Slander and Libel, p 366; Townshend, Slander and Libel (2d, 3d, and 4th ed), § 300." 117 Mich 80, 82, 83.

The Court's fear of frivolous suits hardly seems to be a realistic one. Thus, with regard to torts based upon an allegation of negligent conduct during marriage, the fact finder would be quite justified in taking into account the fact that the alleged negligent conduct occurred during marriage. Negligence is, after all, basically a question of reasonable behavior in the circumstances, and it may well be that conduct which would be actionably negligent as between strangers would not be so as between spouses.

"It must be true that when a man and woman
marry their reciprocal rights and duties are differ-
ent toward each other than toward third persons.
The extent of the difference under the existing law
must be developed by time and experience." *Wait*
v. *Pierce* (1926), 191 Wis 202, 217 (209 NW 475,
480, 48 ALR 276, 285).

"Undoubtedly there is conduct tortious when en-
gaged in by a third person, which would not be
tortious between husband and wife because of the
mutual concessions attending their relationship and
implied in the marriage contract." *Courtney* v.
*Courtney* (1938), 184 Okla 385, 403 (87 P2d 660, 669)..

We shall not comment upon *Bandfield's* somewhat
ludicrous juxtaposition of the argument that inter-
spousal tort suits should not be permitted because
of their potential for disruption of marital harmony
with the helpful hint that, while one who has been
tortiously injured by his spouse should not be per-
mitted to disrupt the marriage relation by suing for
damages, he may nonetheless achieve redress by
means of a divorce.[4] Not only is that argument
absurd, but also it is patently legally faulty, insofar
as it suggests that alimony may be awarded to com-
pensate for a tortious personal injury which has not

---

[4] Dean Prosser was not so charitable:

"The chief reason relied upon by all these courts, however, is that
personal tort actions between husband and wife would disrupt
and destroy the peace and harmony of the home, which is against
the policy of the law. This is on the bald theory that after a husband
has beaten his wife, there is a state of peace and harmony left to be
disturbed; and that if she is sufficiently injured or angry to sue
him for it, she will be soothed and deterred from reprisals by
denying her the legal remedy—and this even though she has left him
or divorced him for that very ground, and although the same courts
refuse to find any disruption of domestic tranquillity if she sues
him for a tort to her property, or brings a criminal prosecution
against him. If this reasoning appeals to the reader, let him by.
all means adopt it. * * *

"The devastating attack on the old rule found in a number of
recent decisions seems to leave no possible justification for it except
that of historical survival." Handbook of the Law of Torts (3d ed,
1964), § 116, pp 883, 885.

impaired the injured spouse's ability to labor. How Stat, § 6245 specifically provided that "if the estate and effects awarded to the wife shall be insufficient for the suitable support and maintenance of herself and such children of the marriage as shall be committed to her care and custody, the court may further decree to her such part of the personal estate of the husband and such alimony out of his estate real and personal, to be paid to her in gross or otherwise as it shall deem just and reasonable, having regard to the ability of the husband and the character and situation of the parties, and all the other circumstances of the case." Alimony was at the time of *Bandfield,* and is today (CLS 1961, § 552-.23, as last amended by PA 1964, No 11 [Stat Ann 1965 Cum Supp § 25.103]), a device whereby a spouse was obliged to discharge an obligation of support, and not a means of recompensing one spouse for tortious injuries endured during marriage. See *Cummings* v. *Cummings* (1883), 50 Mich 305; *Johnson* v. *Johnson* (1956), 346 Mich 418.

It is also of interest to note that two of the three jurisdictions cited by *Bandfield* in support of its holding have since modified their positions. New York now permits by statute interspousal suits, while Maine permits the defendant in a negligence suit by a wife to implead the husband for purposes of contribution. See appendix. Thus, the Maine court's current attitude (see *Bedell* v. *Reagan* [1963], 159 Me 292 [192 A2d 24]) is somewhat different from that which existed in 1877 at the time of *Abbott* v. *Abbott,* 67 Me 304 (24 Am Rep 27), wherein the court dismissed an interspousal suit in these terms: "As said by Settle, J., in *State* v. *Oliver,* 70 NC 60, 'it is better to draw the curtain, shut out the public gaze, and leave the parties to forget and forgive.' " 67 Me 304, 307. Subsequently, even

North Carolina renounced its former rule in favor of one permitting a wife to maintain a tort suit against her husband. *Roberts* v. *Roberts* (1923), 185 NC 566 (118 SE 9, 29 ALR 1479).

We do not consider it necessary, in the context of the cases we are here called upon to decide, in two of which the marriage relation was already ended before suit was commenced and in the third the marriage was contracted notwithstanding the pendency of the litigation, to consider further the *a priori* argument that to permit interspousal personal tort suits would rend the gossamer fabric of marital felicity.

In *Harvey* v. *Harvey* (1927), 239 Mich 142, the second case in which our Court considered interspousal tort immunity, a wife passenger sought to recover against her husband driver for injuries incurred in an automobile accident. Plaintiff argued that an amendment[5] to the married women's act should be construed to permit such suits, but this Court rejected the argument. It is evident from the Court's opinion that aside from its narrow interpretation of the statute the Court believed that no such right of action based solely upon the common law should exist either, primarily for two reasons:

First, the Court observed that "we can conceive of circumstances where liability insurance, carried by the husband, might prove the moving factor [in the initiation of a suit]", 239 Mich 142, 146. Implicit in the Court's speculation is the assumption that to permit such suits would be to promote collusion between spouses in the bringing of suit. We are not persuaded that the possibility of such collusion justifies the judicial concern expressed for it. For over half a century, in an increasing number of States

---

[5] In the judicature act of 1915. See CL 1948, § 612.6 (Stat Ann § 27.658), the provisions of which are now incorporated in CLS 1961, § 600.2001 (Stat Ann 1962 Rev § 27A.2001).—Reporter.

and in the United Kingdom, interspousal tort suits have been permitted in varying degrees and no evidence yet has been adduced to show that the administration of justice has been perverted thereby. The possibility of collusion exists in any lawsuit, and while conceivably it might be somewhat greater when the opposite parties are husband and wife and an insurer lurks in the background, skilled cross-examination and the perceptivity of our triers of fact make its success unlikely. To suggest otherwise is to reject the effectiveness of our adversary system for making fact determinations, a radically extreme position we are not yet ready to take.

The shibboleth of collusion between spouses, to which there was direct allusion in *Harvey* v. *Harvey,* has been raised often as an obstacle to suits between spouses and, as well, in other suits in which the marriage relation is involved. Thus, in *Glover* v. *Alcott* (1863), 11 Mich 470, the Court stated that a wife could not carry on a general trade or business on credit. Mr. Justice CHRISTIANCY noted that while the object of the married women's act was benevolent, and "while it should be fairly and liberally construed for these purposes, the greatest care and circumspection are required to guard, as far as possible, against its being made a mere cloak for the frauds of the husband upon his creditors, of which it is peculiarly susceptible; and which it was no part of the legislative design to facilitate." 11 Mich 470, 485, 486. In his dissent, Mr. Justice CAMPBELL expressed more confidence in our trial system:

"Fraud, in such cases, is a question of fact, and not of law. I think in the case before us the court below presented the whole case to the jury with great fairness. The peculiar character of the transaction was fully commented on, and their attention was called to every thing which could throw light on the

case. * * * The real facts are such as to require from a jury a much sharper scrutiny, and are much more suspicious, than if the married relation did not exist. This, however, was fairly laid before them, and we must presume their deliberate conclusion was arrived at by regarding it." 11 Mich 470, 494.

The correctness of Justice Campbell's views is borne out by subsequent decisions of this Court, vitiating Justice Christiancy's holding, and the resultant absence of the forewarned economic chaos predicted to accompany such collusive suits. See, *e.g.,* Mr. Justice Cooley's opinion in *Tillman* v. *Shackleton* (1867), 15 Mich 447 (93 Am Dec 198).

Second, in addition to decrying the dangers of collusion, the Court in *Harvey* v. *Harvey* based its decision upon the thesis that a married woman has no legal existence during coverture. In support of this thesis, it turned to the common and statutory law of Virginia, as construed by its court:

"In *Keister's Administrator* v. *Keister* [123 Va 157, 160, 161, 96 SE 315, 1 ALR 439], *supra,* the court stated that the statute of Virginia provides: * * *

" 'A married woman may contract and be contracted with, sue * * * in the same manner and with the same consequences as if she were unmarried, whether the right or liability asserted by * * * her, shall have accrued before or after the passage of this act,' * * * and, in holding the statute does not confer upon a married woman a right of action against her husband for a personal tort, so well considered the subject involved in the case at bar that we make liberal quotation therefrom: * * *

" 'The primary inquiry confronting us in the instant case, therefore, is whether the married women's statute in Virginia, the portion of which relied on by the plaintiff in error is quoted above, confers

upon married women during coverture the substantive civil right essential to support a cause of action in a suit at law for damages instituted during the coverture by a wife against her husband, for an assault upon her committed by the husband during the coverture?

" 'The substantive civil right in question is a legal existence—a legal personality—of a married woman, separate and apart from the legal personality of her husband, during coverture. Such a right a married woman had not and has not at common law.' " 239 Mich 142, 147, 148.

The assertion that at common law a married woman had no legal existence during coverture is one to which any perceptive analysis of the cases gives lie, and yet it has been made by jurists of some notoriety:

"By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband.   *   *   *   Upon this principle, of a union of person in husband and wife, depend almost all the legal rights, duties, and disabilities, that either of them acquire by the marriage." 1 Blackstone, Commentaries on the Laws of England, ch 15, p 442 (1 Cooley [4th ed 1899], p 387).

Illustrative of the attitude of many nineteenth century American courts is the case of *Ritter* v. *Ritter* (1858), 31 Pa 396:

"One of the favourite maxims of the common law is, that marriage makes the man and woman one person in law, and of course it excludes the possibility of a civil suit between them. Now this characteristic of the contract may be considered a fiction, an absurdity, a fossil, or whatever else the necessities of the new era may denominate it, but it is in exact accordance with the revealed will of God, was de-

signed for the protection of the woman, and leads to that identification of sympathies and interests, which secures to families and neighbourhoods the blessings of harmony and good order.

"It is doubtless competent for the legislative power to change and modify the qualities of the marriage relation, perhaps to abolish it altogether; but if the history of the human race teaches any lesson whatever, it is, that concubinage is the alternative of marriage. In just so far as you impair the one, you encourage the other. In just so far as you sever the material interests of husband and wife, you destroy the sympathies which constitute the oneness of the relation, and degrade the divine institution to mere concubinage.

"Nothing could so complete that severance and degradation, as to throw open litigation to the parties. The maddest advocate for woman's rights, and for the abolition on earth of all divine institutions, could wish for no more decisive blow from the courts than this. The flames which litigation would kindle on the domestic hearth would consume in an instant the conjugal bond, and bring on a new era indeed—an era of universal discord, of unchastity, of bastardy, of dissoluteness, of violence, cruelty, and murders.

"But will the courts expose this fundamental relation to the consequences of unbridled litigation? Never." 31 Pa 396, 398.

Notwithstanding such bold proclamations, we have examined the status of married women at common law to determine whether there was indeed such a legal unity of husband and wife at the common law.[6]

It cannot be doubted that superficially, at least, the common-law treatment of torts involving a married woman can be explained upon the basis that during coverture the wife had no legal personality.

---

[6] See, generally, the definitive discussion of "The Married Woman" in 3 Holdsworth, A History of English Law (1st ed, 1909), pp 404–416.

Thus, procedurally the husband had to join or be joined in tort suits by or against his wife. If, however, the wife were legally extinct in such circumstances, it would be logically inappropriate to speak of *her* committing a tort since, her personality being extinct, she should be viewed as but the alter ego of her husband. Despite the esoteric talk of "unity" the common law in practice has been quite realistic and very early recognized that a wife can commit a tort:

"  *  *  *  Si brief de trespas de batery soit port envs le baron et la femme, supposant que eux deux duissent auer bate le pl', et le baron appiert et la femme nemy, le baron respond sans la feme, pur ceo q lact est port auxibien de son tort, come de la torte de la feme."  Y.B. 36 Hy VI p I pl I (Wight ed, 1601).[7]

Similarly, when a tort was committed against a wife, although the common law procedurally required that the husband join in the suit, it in fact recognized that the cause of action inhered in the wife and not in the husband, which would be the case if the wife's personality were not legally cognizable. This certainly is the purport of *Weller* v. *Baker* (1769), 2 Wils KB 414 (95 Eng Rep 892):

"Lastly, it was objected that the husbands and wives ought not to have joined in this action. In answer to this, it is very difficult to reconcile all the cases in the books touching this matter of joinder in action; at present it is sufficient for us to say that this action is not grounded on any contract express or implied, but the husbands are joined to assert the right and interest of their wives, which has been

---

[7] If a writ of trespass for battery be brought against the husband and the wife, supposing that they both might have beaten the plaintiff, and the husband appears and the wife not, the husband answers without the wife, inasmuch as the action is brought as well for his tort, as for the tort of the wife. (Translation furnished.)—REPORTER.

disturbed and injured by the defendant; whatever be the nature of this right, interest, or employment, it is her own, the husband hath nothing at all to do with it, he only joins for conformity;   *   *   * Wherever the wife is the meritorious cause she may join in action: a very strong case to this purpose is 2 Sid 128, and so is Cro Jac 77[8] which was case by baron and feme upon an assumpsit for curing a wound by the wife, and alleged in facto that she cured it, resolved she was the cause of the action, and so the action brought in both their names was well enough. The case, of *Holmes and Wife* v. *Wood* * * * was an action upon the case wherein the plaintiffs declared upon a quantum meruit for a cure done by the plaintiff's wife; and upon another count for medicines and plasters found and provided for the defendant; upon a general demurrer it was objected that the wife could not join, for that she was not the sole cause of the action, because the medicines and plasters were the husband's own property, and the damages could not be severed; and of that opinion was the Court; but they said that if the action had been brought for the labour of the wife only, she might well have joined." 2 Wils KB 414, 423, 424.

If an action sounding in tort were brought against husband and wife, predicated upon an act of the wife, the substantive superfluity of the husband is shown further by the fact that the action would not abate upon the husband's death.

"Ejectment. After verdict for the plaintiff, it was moved, that the husband was dead since the Nisi Prius and before the day *in banco*. The question was, whether the bill should abate in all, or should stand against the wife?—And because it is in nature of an action of trespass, and the wife is charged for her own fact, it was adjudged, that the action

---

[8] *Manby* v. *Scott*, 2 Sid 109, 128 (82 Eng Rep 1000, 1011), and *Bradford* v. *Budsingham*, Cro Jac 77 (79 Eng Rep 65).—Reporter.

continued against the wife, and judgment should be entered against her sole, because the husband was dead." *Rigley* v. *Lee and His Wife* (1614), Cro·Jac 356 (79 Eng Rep 304).

When a woman married, her personal property became the property of her husband. The choses in action possessed by an unmarried woman were, of course, personalty, and among such choses in action might be included a cause of action in tort. The choses in action which a woman took with her into marriage became her husband's only if he reduced them to possession during coverture. If he did not do so, they remained the woman's when she was released from coverture. The rights inhered in the woman, and although during coverture the husband could bring suit, his suit properly viewed would be derivative depending for its vitality upon subsistence of the marital relationship.

Thus, it was indeed an egregious error for this Court in *Harvey* to embrace so heartily the Virginia court's statement that a married woman (p 148) "had not and has not at common law" a legal personality or existence apart from that of her husband. In the context of the issue we here consider, it would be proper to say that a married woman was under a judicially created personal disability to maintain suit in her own name, but it is ignoring legal reality to say that a married woman had no legal existence. Pollock and Maitland's considered conclusions are of value:

"In particular we must be on our guard against the common belief that the ruling principle is that which sees an 'unity of person' between husband and wife. * * * We do not treat the wife as a thing or as somewhat that is neither thing nor person; we treat her as a person. Thus Bracton tells us that if either the husband without the wife, or the

wife without the husband, brings an action for the
wife's land, the defendant can take exception to this
'for they are *quasi* one person, for they are one
flesh and one blood.' But this impracticable propo-
sition is followed by a real working principle:—
'for the thing is the wife's own and the husband is
guardian as being the head of the wife.' The hus-
band is the wife's guardian:—that we believe to be
the fundamental principle; and it explains a great
deal, when we remember that guardianship is a
profitable right." 2 History of English Law Before
the Time of Edward I (2d ed 1899), pp 405, 406.

The third case to present the issue of interspousal
tort immunity to this Court was *Riser* v. *Riser*
(1927), 240 Mich 402 (27 NCCA 518). Defendants,
husband and wife, invited plaintiff and her husband
to accompany them in defendants' vehicle on a short
automobile jaunt. Plaintiff's husband drove on the
return leg of the journey and while he was driving
an accident occurred in which plaintiff was injured.
Plaintiff brought suit against defendants, and this
Court held that defendants' motion for dismissal
should have been granted:

"Plaintiff might not recover in tort damages
against her husband for her injuries occasioned by
his negligence. See *Harvey* v. *Harvey,* 239 Mich.
142, where the matter is considered at length. As
plaintiff may not recover against her husband, the
driver of the car, she cannot recover against the
owners, defendants, for whom he drove.

" 'The liability of the owner of a motor vehicle
for damages caused by the negligent operation
thereof by another person, rests upon the doctrine
of agency, express or implied.

" 'The liability is based upon the doctrine of *re-
spondeat superior.* If the servant is not liable the
master is not liable. Hence the master may not be
liable for injuries sustained by the wife of the driv-

er."[9]  *Maine* v. *James Maine & Sons Co.*, 198 Iowa,
1278 (201 NW 20, 37 ALR 161)."   240 Mich 402,
404.

But for subsequent developments, the case would
be of little interest since it does not discuss inter-
spousal suits except for its citation to *Harvey*.  The
Court in *Riser* reasoned that since plaintiff could
not sue her husband for his negligence, she could not
sue defendants either, as whose agent plaintiff's
husband was acting in driving, despite the existence
even then of the owner liability act, PA 1915, No
302, § 29.[10]  However, in *Moore* v. *Palmer* (1957),
350 Mich 363, four members of the Court (and sub-
sequently a majority, see *e.g., Kiefer* v. *Gosso* [1958],
353 Mich 19) held that liability under the owner lia-
bility act is not predicated upon the doctrine of
*respondeat superior*.

"We hold that the language referred to in *Geib*
v. *Slater* [320 Mich 316] and *Riser* v. *Riser* [240
Mich 402], holding the Michigan owner liability act
to be based upon the doctrine of *respondeat superior*
is expressly overruled."   350 Mich 363, 394.

Thus, since the decisions in *Moore* and *Kiefer*,
defendants in a suit like *Riser* could not take ad-
vantage of the husband's immunity from suit to
escape liability under our statute.  As we have
noted, see appendix, such a result is not unusual in
States which claim continuing adherence to the im-
munity doctrine as applied to suits between spouses.
Thus, the law in Michigan presently presents the
anomaly that while a wife may not allege and prove
the negligence of her husband in a suit against him,

---

[9] The *Riser* Court purported to quote from the cited *Maine* case.
An examination of that case discloses that the allegedly quoted ma-
terial is not to be found therein.

[10] The provisions of section 29 are incorporated in the present
Michigan vehicle code, PA 1949, No 300, § 401 (CLS 1961, § 257.401
[Stat Ann 1960 Rev § 9.2101]).—Reporter.

she may do just that in a suit against the owner of a vehicle her husband was driving. The similar illogic of railing against suits by wife against husband as disruptive of marital tranquillity (or conducive to interspousal collusion) and at the same time permitting the wife to sue the husband's employer· upon the basis of the husband's negligent injury of the wife, was commented upon in 1 Harper and James, Torts (1956), pp 646, 647:

"The problem has been raised from time to time in jurisdictions which do not allow tort actions between spouses whether the wife is also precluded from a recovery from the husband's employer when the injury was caused by the husband in the course ·of his employment. The logic of the situation would call for a denial of recovery because the husband would be liable to indemnify his employer. Presumably domestic harmony would be impaired if the wife recovered from him in this circuitous manner quite as much as if she had sued him directly. And if the employer were insured, the insurance company would be subrogated to the employer's claim against the husband. Some cases so hold. But an impressive array of authority has rejected the logic and allowed the wife to recover. 'A trespass, negligent or willful, upon the person of the wife, does not cease to be an unlawful act, though the law exempts the husband from liability for the damage. Others may not hide behind the skirts of his immunity.' In the *Schubert Case* [*Schubert* v. *August Schubert Wagon Co.* (1928), 249 NY 253, 256, 257 (164 NE 42, 64 ALR 293)], Judge Cardozo met the problem of indemnity in the following way:

" 'The master who recovers over against the servant does not need to build his right upon any theory of subrogation to a cause of action once belonging to the victim of the injury. A sufficient basis of [for his] recovery is the breach of an independent duty owing to himself. The servant owes the duty to the master to render faithful service, and must an-

swer for the damage if the quality of the service is below [lower than] the standard.'"

Finally, this Court last considered the issue of interspousal tort immunity in *Kircher* v. *Kircher* (1939), 288 Mich 669 (7 NCCA NS 72). There plaintiff sought to recover against her husband for injuries caused by his alleged negligence in the State of Colorado, which State then already permitted interspousal tort suits. This Court denied such relief in a brief opinion referring to the precedent cases just discussed and noting that such suits are "contrary to public policy in this State".

## II.

The time has come to turn to the facts of the cases now before us, for it is to facts and not abstractions to which ultimately we must direct our attention.[11]

In *Smith* v. *King* plaintiff wife sought to recover against the estate of her husband for injuries incurred when an automobile operated by her husband and in which she was riding was involved in an accident, allegedly as a result of the deceased husband's gross negligence. From the trial court's grant of defendant's motion to dismiss, plaintiff has appealed.

In such circumstances, we can see no reason why suit should not be permitted. Collusion between the spouses is impossible and death has already destroyed "the sacred relation of man and wife", so that "public policy" does not enter as a bar.

In *Dood* v. *Mosher*, plaintiff Bernard Dood was residing as a boarder in the home of defendant Dorothy Mosher when, on May 16, 1962, he was

---

[11] "'You are to be in all things regulated and governed,' said the gentleman, 'by fact. We hope to have, before long, a board of fact, composed of commissioners of fact, who will force the people to be a people of fact, and of nothing but fact.'" Dickens, Hard Times (Oxford Univ Press ed, 1955), ch 2, p 7.

injured by stepping on a rusty nail while walking around an outbuilding at defendant's home. On July 16, 1962 plaintiff gave written notice to defendant of this injury, which required hospitalization and resulted in plaintiff's loss of work for six months. On April 3, 1963 plaintiff filed suit against defendant, she was served on April 4th, and the parties were married on April 5th. Plaintiff appeals from a summary judgment in favor of defendant.

Here again, we can conceive of no public policy which should bar such a suit. The parties, aware of the pendency of the suit, nonetheless chose to be married. How, then, could it be said that permitting such suit to be maintained would disrupt the marriage? Indeed, were we to require dismissal of such suits upon the marriage of the parties, would we not discourage a relationship we are told it is the law's policy to encourage? Perhaps more pertinent is the allusion in *Harvey* v. *Harvey,* 239 Mich 142, 146, to the possibility of collusion in such circumstances. Like Justice CAMPBELL in *Glover* v. *Alcott,* 11 Mich 470, discussed *supra,* we are content to leave to the adversary proceedings and the triers of fact the detection of such untoward, and, indeed, criminal,[12] conduct on the part of the parties litigant.

Finally, we turn to Mosier *v.* Carney. There, plaintiff is administrator of the estate of Maxine Carney. She was killed, while a passenger in a car driven by her husband, when that car collided with a vehicle driven by John Akers. Suit was brought under the wrongful death act (CL 1948, §§ 691.581–691.583 [Stat Ann 1959 Cum Supp §§ 27.711–27.713], now CLS 1961, § 600.2922 [Stat Ann 1962 Rev § 27A.2922]) on behalf of Mrs. Carney's minor children alleging negligence on the part of defendant Akers and gross negligence on the part of defendant

---

[12] CL 1948, § 750.422 (Stat Ann 1954 Rev § 28.664).

husband. Plaintiff appeals from the trial court's order granting defendant husband's motion to dismiss as to him.

It is argued that this action was improperly brought under the wrongful death act which permits an action

"Whenever the death of a person or injuries resulting in death, shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages, in respect thereof." CL 1948, § 691.581 (Stat Ann 1959 Cum Supp § 27.711). CLS 1961, § 600.2922 (Stat Ann 1962 Rev § 27A.2922) eliminated the parentheses and substituted a coma after "would".

Defendant reasons that Mrs. Carney could not have sued her husband had she lived and that, therefore, her estate may not do so after her death. We must remember that the wrongful death act is a remedial statute and thus should be and has been liberally construed by us. See *Merkle* v. *Township of Bennington* (1885), 58 Mich 156 (55 Am Rep 666). The purpose of the statute is, of course, obvious: it was intended to remedy unconscionable results reached in litigation under the common law whereby it was financially less burdensome to tortfeasors to kill than merely to maim their victims.

One who sues under the wrongful death act is not suing solely for a wrong done to the decedent but rather, as well, upon a new cause of action specifically created as a remedy for those who suffer loss because of decedent's death. *Ford* v. *Maney's Estate* (1930), 251 Mich 461 (70 ALR 1315); and see *In re Olney's Estate* (1944), 309 Mich 65, which reaffirmed *Ford* after the 1939 amendment (PA 1939, No 297) to the wrongful death act.

In certain instances we have held that a plaintiff could not recover under the wrongful death act because his decedent could not have maintained an action and recovered damages had he lived. However, an examination of those cases discloses that there would have been some substantive defect inherent in the decedent's hypothetical cause of action. We have never held that because a purely personal immunity might have barred suit by decedent, those injured by his death would also be barred from suit.

Thus, we have said that the contributory negligence of a deceased, the presence of which would be a substantive defect in a suit by him, would bar recovery under the wrongful death act. See *e.g., Baader* v. *Detroit, J. & C. R. Co.* (1924), 228 Mich 104. Other cases, however, demonstrate that this Court has avoided construing the legislative language so technically as to defeat the manifest purpose of the act, namely, to give a cause of action for the benefit of certain designated classes of surviving relatives of a wrongfully killed decedent. For example, in *Lincoln* v. *Detroit & M. R. Co.* (1914), 179 Mich 189 (51 LRA NS 710), defendant sought to defeat plaintiff's cause of action for recovery of the earnings potential of his deceased minor son by arguing that had the son survived he "could not have sued the defendant for the recovery of his earning power, for that belonged to his parents". 179 Mich 189, 194. Such an interpretation was, strictly speaking, open to the Court, but it rejected it, considering the act in these terms:

"1. We summarize the following from the American authorities: The death loss act of the English statute of 1846 (St 9 & 10 Vict No 93), commonly called 'Lord Campbell's act,' and the various laws of a similar kind that have been modeled after it, gave a new cause of action unknown to the common law, for the benefit of certain designated classes of

surviving relatives. Such relatives do not take the cause of action for damages to the deceased by transfer to them by operation of law, or otherwise, but are enabled by the statute to recover the pecuniary loss to themselves caused by the wrongful taking off of the decedent, the continuation of whose life would have been beneficial to them. The action accrues to the surviving beneficiary mentioned in the statute by reason of the death of the injured person caused by the wrongful act of another. It is strictly not proper to say that it is a cause of action which survives; it is rather a new action given by CL 1897, §§ 10427 and 10428 (5 How Stat [2d ed], §§ 13702, 13703), which can be brought, not for the benefit of the estate but solely for the benefit of the beneficiaries named in the statute. The above sections, when compared with CL 1897, § 10117 (5 How Stat [2d ed], § 12761), are made plain. They refer to entirely distinct losses recoverable in different rights. Section 10117 refers to the right of the deceased for the loss and injury occasioned to him. Sections 10427 and 10428 refer to the right of the surviving relatives as beneficiaries for the loss to them. Both are dependent on the injury. The language of one provision is that 'actions for personal injuries shall survive,' and of the other 'in case of the death of a person by the wrongful act of another.' Section 10117 creates no new liability, but prevents the lapsing by death of an old one, while sections 10427 and 10428 create a new liability, one not known to the common law." 179 Mich 189, 195, 196.

The Court held that since the minor could have recovered damages for wrongful injury had he survived, his parents could recover damages of a different nature for loss of his earning power.

The Court's discussion of the fateful words "if death had not ensued" persuades us that it interpreted them as barring suit on a decedent's death only if there were some substantive defect in de-

cedent's case. Thus, the Court discussed contributory negligence and the fellow servant rule as instances when suit by surviving relatives would be barred.

We must never lose sight of the fact that the legislature under the wrongful death act sought to impose liability in case of the death of a person by the wrongful act of another. None of the Michigan interspousal tort cases we have considered challenges the apodictic fact that one spouse may injure another wrongfully and fatally. Indeed, they all admit that one spouse may injure another tortiously, but bar the suits on other grounds.[13]

We do not believe the legislature intended that in such cases as Mosier, the administrator's suit, any recovery upon which will inure to the benefit of decedent's minor children, should be defeated merely because earlier cases in this Court indicated that had decedent survived she would have been barred from suing her husband. There have been pleaded wrongful acts of defendant resulting in decedent's death. Nowhere in his pleadings does defendant aver any fault on the part of his deceased wife which might have constituted a substantive defect to suit by her. Rather he relies entirely upon the bar raised by his alleged personal immunity from suit by her.

In this regard, we are in accord with the supreme court of Minnesota which, although acknowledging that interspousal suits are forbidden there, held, in the face of an asserted defense of interspousal tort immunity, that under a wrongful death act similar to Michigan's a suit might be brought against the estate of a husband for damages sustained by

[13] See, also, *Johnson* v. *People's First National Bank & Trust Co.* (1958), 394 Pa 116, 121 (145 A2d 716, 718); *Long* v. *Landy* (1961), 35 NJ 44, 50, 51 (171 A2d 1, 4); *Germillion* v. *Caffey* (La App 1954), 71 So 2d 670, 672.

the wife. *Poepping* v. *Lindemann* (1964), 268 Minn 30 (127 NW2d 512). In concluding that the language of the Minnesota wrongful death act giving an action "if the decedent might have maintained an action, had he lived" did not bar plaintiff's action, the Minnesota court relied upon and quoted from its earlier decision in *Shumway* v. *Nelson* (1961), 259 Minn 319, 322, 323 (107 NW2d 531):

" 'This clause refers to the facts and circumstances giving rise to the cause of action, as well as any facts or circumstances pertaining to any permissible defenses such as contributory negligence, rather than to the person by whom the action could be maintained.

" 'This conclusion is strengthened by the fact that upon death of one spouse the rationale of the marital-immunity doctrine loses whatever force it might otherwise have had. *Where the marriage has been terminated by death any danger of domestic discord arising from the enforcement of the action has, likewise, terminated.* We do not believe that we should ascribe to the legislature an intent to extend the intrafamily immunity doctrine to situations where its existence is without any reasonable justification.' " Emphasis added by *Poepping*, 268 Minn 30, footnote, 35 (127 NW2d 512, footnote, 515, 516).[14]

## SUMMARY.

We have examined the Michigan precedents and have found nothing in them which logically militates against permitting prosecution of the suits here involved. Indeed, as we have seen the "reasoning", if it may be called that, of those cases, has no applicability in the fact circumstances of these

---

[14] See, also, *Johnson* v. *Ottomeier* (1954), 45 Wash 2d 419 (275 P2d 723); *Welch* v. *Davis* (1951), 410 Ill 130 (101 NE2d 547, 28 ALR2d 656); *Deposit Guaranty Bank & Trust Co.* v. *Nelson* (1951), 212 Miss 335 (54 So 2d 476); *Fitzpatrick* v. *Owens* (1916), 124 Ark 167 (186 SW 832, 187 SW 460, LRA 1917B, 774).

instant cases of first impression. It is appropriate to add that what we have said here concerning the doctrine of interspousal tort immunity must be considered in light of these same fact circumstances. We this day hold: (1) that a suit may be maintained predicated upon injuries to one spouse during marriage arising out of an allegedly wrongful act of the marital partner, when the allegedly wrongful act resulted in termination of the marriage by death; (2) that a suit commenced before marriage of the parties thereto may be maintained by one spouse against the other for an alleged antenuptial tort.

These cases are reversed and remanded to the trial courts for further proceedings. No costs, a question of public importance being involved.

APPENDIX.

The jurisdictions which have abolished the defense of interspousal tort immunity in whole or in part may be classified as follows:

(1) Those in which the courts have permitted interspousal suits in general; *e.g.*, *Williamson* v. *Massachusetts Bonding & Insurance Co.* (1955), 142 Conn 573, 579 (116 A2d 169, 172), "It is, and for many years has been, the law of Connecticut that a wife may bring and maintain an action against her husband to recover for personal injuries caused by his negligent act or acts in this State"; *Gilman* v. *Gilman* (1915), 78 NH 4 (95 A 657, LRA 1916B, 907), "If a married woman is either injured or damaged by another's illegal act, the statute gives her a remedy even though that other is her husband"; *Brandt* v. *Keller* (1953), 413 Ill 503 (109 NE2d 729), holding that in all cases a married woman may sue and be sued as if she were unmarried; the legislature subsequently added to the Illinois married

women's act the proviso "that neither husband nor wife may sue the other for a tort to the person committed during coverture."[15]  Nonetheless in *Calvert v. Morgan* (1963), 41 Ill App 2d 23 (190 NE2d 1), the Illinois appellate court permitted the administrator of a deceased wife's estate to sue, for the benefit of the wife's children, the estate of her husband, who had murdered her and killed himself. Accord, *Deposit Guaranty Bank & Trust Co.* v. *Nelson* (1951), 212 Miss 335 (54 So 2d 476); *Fitzmaurice* v. *Fitzmaurice* (1932), 62 ND 191 (242 NW 526), wife may sue husband for personal tort; reserved question of whether husband has like right; *Scotvold* v. *Scotvold* (1941), 68 SD 53, 66 (298 NW 266, 272), "a civil action is maintainable in this jurisdiction between husband and wife for damages for personal tort committed by one against the other"; *Prosser* v. *Prosser* (1920), 114 SC 45, 47 (102 SE 787, 788), "by a liberal and not by a strict construction the code of procedure was enacted to give to a wife every remedy against her husband for any wrong she might suffer at his hands"; *Penton* v. *Penton* (1931), 223 Ala 282, 285 (135 So 481, 483), an action "may be maintained by the wife against the husband for his actionable simple negligence"; *Katzenberg* v. *Katzenberg* (1931), 183 Ark 626 (37 SW2d 696), and *Leach* v. *Leach* (1957), 227 Ark 599 (300 SW2d 15), wife may sue husband, and husband may sue wife, for negligent injuries; *Rains* v. *Rains* (1935), 97 Colo 19, 25 (46 P2d 740, 743), "We hold that in this State a wife may sue her husband for personal injuries caused by the negligence of her husband"; *Courtney* v. *Courtney* (1938), 184 Okla 395, 404 (87 P2d 660, 670), "one spouse may sue the other for the recovery of damages for personal injury resulting from the negligence of the latter";

---

[15] Ill Anno Stat, c 68, § 1.—REPORTER.

*Self* v. *Self* (1962), 58 Cal 2d 683 (26 Cal Rptr 97, 376 P2d 65), and *Klein* v. *Klein* (1962), 58 Cal 2d 692 (26 Cal Rptr 102, 376 P2d 70), abolishing the doctrine of interspousal tort immunity as to intentional and negligent torts, respectively; *Cramer* v. *Cramer* (Alaska, 1963), 379 P2d 95, 97, wife may "bring an action against her husband, during coverture or thereafter, for a tort to her person caused by his negligent conduct while the parties were married to each other"; *Damm* v. *Elyria Lodge No 465* (1952), 158 Ohio St 107, 116 (107 NE2d 337, 342), court held that wife might maintain negligence action against voluntary unincorporated association of which deceased husband had been member, noting that, "No statute expressly prohibits actions by a wife to recover damages from her husband for personal injuries inflicted upon her by him." See, also, *Jaeger* v. *Jaeger* (1952), 262 Wis 14 (53 NW2d 740), where the Wisconsin supreme court interpreted the laws of Arizona as permitting interspousal negligent tort suits.

(2) Those which permit interspousal suits when the marital relation has been, or is in the process of being, dissolved or permit suits against a third party even though the suit is predicated upon a spouse's negligence, *e.g., Johnson* v. *Peoples First National Bank & Trust Co.* (1958), 394 Pa 116, 119 (145 A2d 716, 717), although interspousal tort suits may not be maintained during coverture, widow may maintain negligent tort suit against husband's personal representative, since, husband being dead, public policy of "preserving domestic peace and felicity" could not be subverted thereby; *Long* v. *Landy* (1961), 35 NJ 44 (171 A2d 1), essentially similar to *Johnson, supra; Pelowski* v. *Frederickson* (1962), 263 Minn 371, 375 (116 NW2d 701, 704), sustaining third party action by defendant, in suit by widow, against estate of widow's husband, for contribution

or indemnity, general immunity doctrine inapplicable where "death has intervened to forever circumvent all possibility of marital discord"; *Poepping* v. *Lindemann* (1964), 268 Minn 30 (127 NW2d 512, 516), notes that Minnesota has in past applied immunity doctrine, but finds it inapplicable on the facts since "the cause of action which arises when one spouse sustains personal injury by reason of the conduct of the other can be asserted against the estate of the latter"; *Ennis* v. *Truhitte* (Mo 1957), 306 SW2d 549, wife may sue administrator of husband's estate for negligent injuries inflicted by husband; *Lorang* v. *Hays* (1949), 69 Idaho 440 (209 P2d 733), wife may maintain action against divorced husband even though tort complained of was committed during coverture, tenor of opinion is that actions should also be permitted during coverture; *Kowaleski* v. *Kowaleski* (1961), 227 Or 45, 61 (361 P2d 64, 71), wife may sue husband's employer for husband's negligence since "husband's personal immunity should not extend to his employer"; see 227 Or 51 (361 P2d 67) for citations of cases in Florida, Georgia, Massachusetts, Mississippi, Ohio, and Vermont with similar holdings; *Johnson* v. *Ottomeier* (1954), 45 Wash 2d 419 (275 P2d 723), immunity rule does not operate to abate suit for benefit of wife's children by wife's personal representative against husband's estate under wrongful death act; *Goode* v. *Martinis* (1961), 58 Wash 2d 229, 236 (361 P2d 941, 945), tenor of general discussion is critical of immunity doctrine, but court limits holding to availability of suit in case of "an alleged intentional tort committed by one spouse against the other during the pendency of previously initiated divorce proceedings when the parties are legally separated"; *Gremillion* v. *Caffey* (La App 1954), 71 So 2d 670, while wife could not sue husband in tort during marriage, she could do so after divorce for tort committed during marriage

but after a legal separation; *Bedell* v. *Reagan* (1963), 159 Me 292 (192 A2d 24), forbids suits between husband and wife but permits defendant in suit by wife to implead husband for contribution, wife's injuries having been received in automobile accident wherein conceivably both husband and defendant were negligent; *Taylor* v. *Patten* (1954), 2 Utah 2d 404 (275 P2d 696), wife may recover damages from husband for injuries intentionally inflicted upon her during interlocutory period of divorce action.

(3) Those which permit suits for antenuptial torts: *Brown* v. *Gosser* (Ky, 1953), 262 SW2d 480 (43 ALR2d 626), permits suit by wife against husband for antenuptial tort, suit having been begun prior to marriage, tenor of opinion is wholly to reject common-law immunity rule; *Hamilton* v. *Fulkerson* (Mo 1955), 285 SW2d 642, wife not barred from continuing to maintain suit against husband for antenuptial tort; dictum (p 647) that *Mullally* v. *Langenberg Bros. Grain Co.* (1936), 339 Mo 582 (98 SW2d 645), which held that while wife could not sue husband, she could sue his employer for injuries done her as result of husband's negligence during scope of his employment, "clearly indicates that this court must have recognized that there were no considerations of public policy weighty enough to prohibit a wife's suit against her husband for a personal tort even though committed during marriage."; *O'Grady* v. *Potts* (1964), 193 Kan 644 (396 P2d 285), existence of common-law immunity rule does not bar action by wife against husband for alleged antenuptial tort; *Curtis* v. *Wilcox*, [1948] 2 KB 474, overruling *Gottliffe* v. *Edelston*, [1930] 2 KB 378, permitted suit by wife on antenuptial tort, but *Baylis* v. *Blackwell*, [1952] 1 KB 154, denied right of husband to maintain similar suit.

(4) Those which anomalously permit wives but not husbands to sue: *Roberts* v. *Roberts* (1923), 185 NC 566 (118 SE 9, 29 ALR 1479), and *Scholtens* v. *Scholtens* (1949), 230 NC 149 (52 SE2d 350); *Wait* v. *Pierce* (1926), 191 Wis 202 (209 NW 475, 48 ALR 276), and *Fehr* v. *General Accident Fire & Life Assur. Corp.* (1944), 246 Wis 228 (16 NW2d 787, 160 ALR 1402).

(5) In New York, interspousal tort suits are authorized by statute, but not if the defendant is insured unless the policy so states.[16]

* * *

This passage in 1 Harper and James, Torts (1956), pp 645, 646, is representative of the scholarly consensus on the subject of the doctrine of interspousal tort immunity:

"The rule denying recovery has been applied literally and blindly in many cases where the reason for the rule could not possibly apply inasmuch as there was no home to disrupt and no domestic harmony to disturb. The divorce cases are typical examples. So, too, are cases in which the wife's administrator seeks to recover for her wrongful death. This rule has been applied even when the wife was murdered by her husband and where the wife's administrator sued the husband's administrator.

"But a strong and probably increasing minority view permits the wife to sue her husband for such harms, especially if they are intended wrongs. A few liberal decisions have permitted the action for the husband's negligence. This result seems eminently desirable. The metaphysical and practical reasons which prevented such actions at common law are no longer applicable. The danger to the

---

[16] See 23A McKinney's Consol Laws of NY, General Obligations Law, § 3–313; and 27 McKinney's Consol Laws of NY, Insurance Law, § 167, subd (3).

family peace and tranquillity here, as in the case of suits by an infant against his parent, has been grossly over-emphasized. Sound policy and ordinary fairness commend the right of the wife to recover for tortious invasions of her interests in personality by her husband. While as much might be said to favor an action by the husband for a harm to his person by his wife, he did not have such an action at common law and no statutes purport to enlarge his rights against his wife. But the statutes under which a married woman is liable generally for her tort are not likely to be interpreted to make her immune to her husband, and liability to him should no doubt accompany the converse rule of liability on his part for bodily harm inflicted by him on her."

See, also, Prosser, A Handbook of the Law of Torts (3d ed 1964), pp 879–885; McCurdy, Torts Between Persons in Domestic Relation, 43 Harv L Rev 1030 (1930); McCurdy, Personal Injury Torts Between Spouses, 4 Villanova L Rev 303 (1959); Albertsworth, Recognition of New Interests in the Law of Torts, 10 Cal L Rev 461 (1922); Morris, What Price Marriage?, 1946 Insurance LJ 911; Haglund, Tort Actions Between Husband and Wife, 27 Georgetown LJ 697 and 893 (1939); Farage, Recovery for Torts Between Spouses, 10 Ind LJ 290 (1935); Sanford, Personal Torts Within the Family, 9 Vanderbilt L Rev 823 (1956); Comment, 23 Yale LJ 613 (1914); Comment, 33 Yale LJ 315 (1924); Comment, 26 Ill L Rev 88 (1931); Comment, Tort Liability Within the Family Area—A Suggested Approach, 51 NW UL Rev 610 (1956); Notes: 34 Harv L Rev 676 (1921); 48 Harv L Rev 849 (1935); 26 Colum L Rev 895 (1926); 35 Colum L Rev 781 (1935); 48 Colum L Rev 961 (1948); 27 Yale LJ 1081 (1918); 28 NCL Rev 109 (1949); 22 Cornell

LQ 274 (1937); 24 Mich L Rev 618 (1926); 37 Wash
L Rev 233 (1962).

T. M. KAVANAGH, C. J., and DETHMERS and ADAMS,
JJ., concurred with SOURIS, J.

SMITH, J. (*concurring in reversal*).  I concur in
the results reached by Justice THEODORE SOURIS and
express herein some limits to my concurrence.

In its broad sweep, the reasoning in Justice
SOURIS' opinion goes well beyond the necessities of
the 3 cases.  Although in some situations, this may
be good judicial craftsmanship, I doubt its value in
this kind of gate-opening decision.  In this situation,
it has the effect of a broad "come-one, come-all" in-
vitation.  The opinion will likely be construed as
erasing, in the ultimate analysis, interspousal im-
munity in every conceivable type of tort case, from
the grossest intentional tort down to the chronic
irritants present in many marriages.  I wish it to
be understood, then, that in concurring in the hold-
ing of Justice SOURIS' opinion, I am not voting for
the abolition of all interspousal tort immunity in
Michigan, but for the specific result in the cases
before us.

Each of the 3 cases brings some special merit
why the old rule should not apply.  In Smith *v.*
King, where the marriage no longer exists by reason
of the car accident which was fatal to the husband
and which seriously injured the wife, the old rea-
soning is not persuasive.  In this case, plaintiff
alleges that she received multiple fractures, severe
internal and external injuries, and permanent dam-
age by reason of her deceased husband's "wilful and
wanton misconduct."  The misconduct consisted in
part of the husband's insistence upon driving from

Michigan to California "nonstop", at least without proper rest. It is also alleged that he failed to heed warnings, refused assistance and operated the car at a dangerous and unlawful speed. It is my opinion that she ought not to be barred from presenting proofs in support of her allegations and recovering her damages if she should prove her case. The public policy reason is inapplicable in this situation because there is no marriage to defend.

In Mosier v. Carney, suit was brought to recover damages on behalf of the children only* for the loss of their mother who died in a car accident, allegedly caused by the gross negligence of the father and the concurring negligence of another driver. If such can be proved, I see no reason for denying to the children compensable damages which they would otherwise receive if the negligent driver had been a stranger.

As to Dood v. Mosher, the injury complained of occurred before marriage and allegedly resulted in plaintiff losing six months from gainful employment. The fact that the parties were married about a year after the injury should not extinguish the right to sue and recover. And although I fully recognize that the likelihood of collusion rises sharply if there is an identity of economic interests, I am certain that the fact finder will scrutinize such claims with care where plaintiff and defendant are husband and wife and have a substantial identity of economic interest.

Albeit, I am in sympathy with the basic tone of the opinion of Justice Kelly who thinks that this new branch of tort liability could be better delin-

---

* I do not perceive that the husband, who is a beneficiary under the wrongful death act, could recover if his wrong contributed to the wife's death, although the legislature should amend the act to say so, specifically.

eated by the legislature. I differ, however, in his conclusion that because there are so many ramifications we would be better off doing nothing in the cases before us and leaving the whole question to the legislature. Of course, the legislature may or may not act. Courts do not have the same options; they must render judgments between the parties. Cases may not be assigned to committees. Therefore, when, as here, parties call upon us for decision, the matter being within our jurisdictional competence, we must decide.

Because of the many facets to this problem, several resting in existing statutes, it is my hope that the public will again receive the benefit of wholesome, positive, constructive interaction between the judicial branch and the legislative branch. If interspousal and intrafamily liability is to be broadened in keeping with expanded appreciation of the individuality of members of a family, particularly wives and children, a number of statutes will have to be re-examined. The priority question is, of course, to what extent shall intrafamily suits be permitted? For intentional torts only? If so, for what kind, gross or minor? Or for both? Is any distinction to be made between duties arising strictly out of the marriage or family relationship and duties owed generally from one person to another? Shall suit be barred if the parties are still in a viable family relationship? The answers to these and similar questions will dictate to what extent contemporaneous adjustments are necessary in other statutes touching upon related aspects of family law.

What we decide today, although somewhat less than a modest first step, is not earth shaking. It is a sound beginning into a realm like no other—the

family. It is best that we proceed from here with
caution.

KELLY, J. (*dissenting*). Three appeals have been
presented to this Court involving different facts,
but all three have two things in common: (1) They
are based on one spouse's claim of right to recover
damages from another spouse for negligent injury;
and (2) Reversal of the trial courts will require
changing the present interspousal tort immunity law
and making that change retroactive.

Justice SOURIS has called attention that four times
this Court has held that an interspousal tort action
could not be maintained at common law, but does
not comment on legislative change of the common-
law rule. Therefore, this opinion shall first review
the legislative enactments which have granted statu-
tory rights to sue that were prohibited by the com-
mon law.

The first statutory exception to the common-law
rule in Michigan occurred in 1855 when the legisla-
ture by Act No 168 provided:

"Actions may be brought by and against a married
woman, *in relation to her sole property,* in the same
manner as if she were unmarried." (Emphasis sup-
plied.)

The phrase "in relation to her sole property"
made it clear that the legislature gave no right to
a married woman to sue her husband for recovery of
damages for injury resulting from an interspousal
negligent tort.

In 1857 (PA 1857, No 132), the legislature gave
to a married woman certain *rights with respect to
her husband's property* by amending the statute,
and this Court construed this amendment in *Band-
field* v. *Bandfield,* 117 Mich 80 (40 LRA 757, 72 Am
St Rep 550), definitely establishing that it did not

create in a wife any rights to recover damages for personal injury from her husband.

In *Harvey* v. *Harvey*, 239 Mich 142, Justice WIEST, writing for a unanimous Court, held that PA 1915, No 314, ch 12, § 6, which provided, "Whenever a cause of action shall accrue to, or arise against any married woman, she may sue or be sued in the same manner as if she were sole,"[1] did not give plaintiff wife the right to recover damages from defendant husband for injuries she received by his negligence, stating (p 148) that in construing a statute in derogation of the common law it is presumed the legislature had the common law in mind when it enacted the statute and, therefore, the statute will be read along with the provisions of the common law; that the statute under consideration only authorized suits when the cause of action "shall accrue to" her and because under the common law no cause of action in tort can or did "accrue" to her and because there is no statutory authorization for such cause of action in Michigan, either express or implied, she could not maintain her action in tort.

The provision relative to married women contained in the revised judicature act, reading: "Actions may be brought by and against a married woman, as if she were unmarried,"[2] is a rephrasing of the previous statute. It did not change the previous immunity doctrine; was not given retroactive effect, and could not apply to the present appeals where all three claimed torts occurred previous to its effective date of enactment.

Nothing in the common law or statutes justifies appellants' cause of action, and Justice SOURIS does not call attention to provisions of the common law

[1] CL 1915, § 12357; CL 1948, § 612.6 (Stat Ann § 27.658).
[2] PA 1961, No 236, § 2001 (CLS 1961, § 600.2001 [Stat Ann 1962 Rev § 27A.2001]).

or the statutes to come to his conclusion, but frankly states:

"While most of the cases cited in the appendix which have rejected the common-law doctrine purport to base their holdings upon so-called married women's acts, it is evident from many of the opinions that the courts had concluded that the immunity defense no longer had any valid basis in logic, fact, or policy. The fact that virtually the same statutory language is subject to varying interpretations by these courts suggests strongly that the actual basis for many of their decisions is a reappraisal of the common law and its rejection because no longer applicable to the facts of modern civilization.

"We shall pursue a more forthright course in our disposition of the cases at bar. Since the doctrine of interspousal tort immunity is a creation of the common law and since such doctrine has never been codified in this State, it is our duty to re-examine it [the common-law doctrine of interspousal tort immunity] and, if necessary to avoid continuing injustice, to change it."

In this dissent I am not taking issue with Justice Souris' statement *in re* this Court's right, as to the common-law doctrine of interspousal tort immunity, to "if necessary to avoid continuing injustice, to change it," nor am I *agreeing* or *disagreeing* with the changes my Brother recommends which I feel confident followed extensive survey and thoughtful consideration.

Conceding that this Court possesses the right, I believe that the question as to whether injustice is being perpetrated and, if so, to what extent, should be answered by Michigan's 148 legislators rather than by a majority of our Court of eight. I find support to this conclusion in the *amicus curiae* brief which states "that because of the many ramifications which the abrogation of the rule of interspousal

immunity would have upon society as a whole that it is a matter which should be left to the legislature's determination." (Quotation sustained by *Kennedy v. Camp* [1954], 14 NJ 390 [102 A2d 595]; *Smith v. Smith* [1955], 205 Or 286 [287 P2d 572], and *Brawner v. Brawner* [Mo 1959], 327 SW2d 808, certiorari denied 361 US 964 [80 S Ct 595, 4 L ed 2d 546].)

The briefs submitted in these appeals bring into focus one phase of the "many ramifications" and differences of opinion as one contemplates extending the immunity doctrine for the first time in Michigan into the field of torts.

One appellant[3] states:

"The presence of liability insurance prevents impairment of domestic tranquillity. With the advent of liability insurance in automobile cases there seems no reason to continue the doctrine of immunity in those cases still retaining it. The modern law suit is against the insurance company, not the spouse."

Another appellant[4] quotes the following footnote from 43 ALR2d 632, 649:

"In connection with the New York statute permitting a wife to sue her husband for personal injuries, it may be noted that at the same time, the New York legislature enacted a companion statute providing that no insurance policy theretofore or thereafter issued should be deemed to insure against any liability of an insured for injuries to his or her spouse or for injury to property of his or her spouse, unless express provision for such insurance was included in the policy,"

and concludes: "This would seem to adequately protect against what some of the courts have feared

---

[3] Mosier v. Carney.
[4] Dood v. Mosher.

would amount to a 'raid' against an insurance company in interspousal actions."

One *amicus curiae* brief states:

"Rather than being a reason for *not* permitting suit, it is submitted that the availability of insurance is a reason in favor of abolishing immunity. In *Bandfield* v. *Bandfield* the strongest objection to interspousal tort actions appeared to be that they would 'destroy the sacred relation of man and wife.' 117 Mich 80, at 82. But, as pointed out by 1 Harper and James, Law of Torts, § 8.11, p 649, 'where there is insurance protection, there is no menace either to family discipline or to domestic peace.'"

The other *amicus curiae* brief disagrees and answers that "to permit such actions because of the presence of insurance is to encourage collusive suits," and quotes from the 1955 Oregon supreme court opinion in *Smith* v. *Smith*, 205 Or 286, 310, 311 (287 P2d 572, 583), as follows:

"The minority rulings brush aside the risk of collusion by the husband and wife by the simple assertion that the courts know how to deal with collusive suits. But it is obvious that the risk of collusive action increases when the parties plaintiff and defendant are in confidential relationship. The risk of financial loss is ordinarily inducement enough to encourage a sturdy defense. Remove from a defendant the risk of loss and substitute the covert hope of profit and a situation arises which should give us pause. * * * We revere the jury system as the bulwark of individual liberty, but we are also realists, and we know that juries are, as a Kentucky mountaineer once said—'tolerable generous with other people's money,' especially when the aroma of insurance permeates the courtroom."

Michigan's interspousal tort policy does not place it in the column of "minority" States, as is emphasized in the *amicus curiae* brief opposing reversals,

which states: "Two out of every three jurisdictions in this country bar suits between spouses to recover damages for injuries caused by negligence. Note, 13 Drake LR 160, 164 (1964)."

This is true in regard to antenuptial torts. In our present Dood v. Mosher appeal, Kent county Circuit Judge Stuart Hoffius made this point when he stated:

"I see no reason for having Michigan join the minority of the States which have ruled upon this question. If one spouse cannot bring a tort suit against the other spouse for an event occurring after marriage, the same public policy should prevent the action for torts arising prior to marriage. The common-law rule must still prevail."

That Michigan will join the minority if this Court reverses the Kent county circuit judge is further disclosed by the recent 1961 Maryland decision[5] involving a spouse's right to sue a spouse for antenuptial tort, which states:

"The only feature of the instant case that has not been specifically passed upon by our prior decisions is that the alleged wrong occurred before the marriage of the parties. It is generally held, in jurisdictions that deny a spouse the right to sue the other spouse for personal injuries, that the disability obtains, notwithstanding that the wrong for which recovery is sought was a premarital one. Dean Prosser states that some two-thirds of the courts which have considered the emancipatory statutes have refused and still refuse, to construe the same so as to alter the common-law rule; that it is the prevailing view that neither spouse may maintain an action against the other for negligent injuries; and this is true even though the tort was committed before the marriage of the parties. For a collection

_____
[5] Hudson v. Hudson, 226 Maryland 521, 526, 527 (174 A2d 339, 341, 342).

of some of the cases so holding, see annotation, 43 ALR2d 642. It has been held that a spouse cannot maintain such an action even where the wrong was committed, and action brought, before marriage.

"There can be little doubt that a wife could not, at common law, sue her husband for personal injuries inflicted upon her person before marriage, the rule being usually stated that the marriage extinguished her right of action. 41 CJS, Husband and Wife, § 396; 27 Am Jur, Husband and Wife, § 589; and cases there cited. As we have so definitely and flatly held *that neither section 5[6] nor any other statute that has been called to our attention has removed the spousal disability,* we feel impelled to follow our previous decisions (and the great majority of jurisdictions elsewhere) and to hold that the wife's cause of action was extinguished upon her marriage to the defendant, and, consequently, the trial court was correct in sustaining the demurrer to her declaration." (Emphasis supplied.)

This precise antenuptial question was also recently (1962) before the Pennsylvania supreme court,[7] and the court, denying the wife the right to maintain her antenuptial tort action, commented upon the common law and the Pennsylvania statutes as follows:

"At common law *neither* a husband nor wife could sue the other for injuries due to torts committed before or during their marriage. This was based upon the legal premise that a husband and wife are one person, one entity. See, Prosser on Torts (2d ed), 670 (1955). This rule, *now based upon social reasons and public policy* (emphasis supplied), is still followed in a great majority of jurisdictions in the United States. See 43 ALR2d 632; 18 Pennsylvania Law Encyclopedia, Husband and Wife § 82. The same rule has been always strictly adhered to

---

[6] Reference is to Annotated Code of Maryland (1957), art 45, § 5.
[7] *Meisel* v. *Little,* 407 Pa 546, 548 (180 A2d 772, 773).

in this Commonwealth. However, here in Pennsylvania, *it is both statutory and decisional.*"

In reversing Genesee county Circuit Judge Donn D. Parker, in Mosier *v.* Carney, my Brother was confronted with the provisions of the wrongful death act, which provides:

"Whenever the death of a person or injuries resulting in death, shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would *(if death had not ensued)* have entitled the party injured to maintain an action and recover damages, in respect thereof, then and in every such case, the person who  *  *  *  would have been liable, if death had not ensued, shall be liable to an action for damages." CL 1948, § 691.581 (Stat Ann 1959 Cum Supp § 27.711).

Calling for a liberal construction, my Brother concludes that plaintiff should not "be defeated merely because earlier cases in this Court indicated that had decedent survived she would have been barred from suing her husband," and quotes from a Minnesota supreme court decision[8] to sustain his conclusion.

If our legislature overlooked the interspousal tort immunity provision when it enacted the wrongful death act, that error should be corrected by the legislature rather than for this Court to come to such a conclusion and then try to eliminate such error by a liberal construction.

Solely to show that there is disagreement to the Minnesota decision quoted by my Brother to sustain his conclusion in Mosier, I call attention to the recent 1964 Delaware decision:[9]

"In summary, therefore, as recognized by plaintiff, the rule of immunity from suit is well settled in this

[8] *Poepping* v. *Lindemann* (1964), 268 Minn 30 (127 NW2d 512).
[9] *Saunders* v. *Hill* (1964), — Del —, — (202 A2d 807, 810).

jurisdiction and would have prevented Mrs. Loat from maintaining a personal injury action, had she lived, and does prevent her administrator from maintaining a survival action. Plaintiff has been unable to show any express language in the wrongful death statute which indicates a legislative intention to abrogate the common-law rule of immunity from suit. In fact, the statute supports the opposite conclusion, since the statute presupposes the ability of the decedent to have brought a personal injury action had he lived."

This Court, recognizing the importance of this three-case appeal from three different counties, requested that the negligence section of the Michigan State Bar "file a brief *amicus curiae.*" The response, disclosing an extensive survey of public policy throughout the Nation, has rendered a valuable service to this Court and I join Justice SOURIS in expressing our sincere thanks.

The fact that our request for "a brief *amicus curiae*" resulted in two briefs *amicus curiae* is important in deciding whether the doctrine of interspousal tort immunity is "no longer applicable to the facts of modern civilization," and whether, as my Brother states, "it is our duty to re-examine it and, if necessary to avoid continuing injustice, to change it."

My Brother refers to the two briefs by stating: "Indicative of the present ambivalence of thought upon this question is the fact that two briefs were in fact submitted by the bar." I add to that by stating that the width, depth and importance of the subject matter, and different views as to what, if anything, should be done and by whom for Michigan, is disclosed by these two briefs as illustrated by the following:

The brief recommending "that the doctrine which prevents husband and wife from suing one another

to recover damages for personal injuries inflicted by the other be overruled, retroactively," calls "for the extermination, root and branch, of the wayward interspousal immunity doctrine—irrespective of the factual variations," and states that: "The overwhelming weight of scholarly authority rejects the doctrine of interspousal immunity; the current trend of judicial authority also rejects it."

The *amicus curiae* brief that concludes "no change in the rule of interspousal immunity (should) be *made by the Court,*" states that: "Contrary to the charge that the rule of interspousal immunity is a moss-encrusted fossil carried over from the days of Coke and Blackstone, the modern decisions in support of the rule range in point of time from 1927 to as recently as July of 1964. Several reasons have been given by the courts in support of the rule. The majority of the courts hold that to abrogate the rule would introduce disharmony into the home, the family unit, and thereby disrupt domestic peace and accord."

To emphasize that as we leave the days of "Coke and Blackstone" and enter into the days of "modern civilization" State legislatures cannot agree, I call attention to legislative action in the two large and important States of New York and Illinois.

In New York interspousal tort suits are authorized by statute, but no collections may be made from an insured defendant spouse unless the policy of insurance contains provisions to so insure.[10]

In Illinois the legislature, after the supreme court in 1953 held that in all cases a married woman may sue as if she were unmarried, subsequently added to the Illinois married women's act the legislative provision "that neither husband nor wife may sue the

---

[10] Consolidated Laws of New York, vol 23A, General Obligations Law, § 3–313, and vol 27, Insurance Law, § 167, subd 3.

other for a tort to the person committed during coverture."[11]

Legislative changes in regard to interspousal torts would undoubtedly apply to the future and not to the past, and would be in sharp contrast to the change in law my Brother is advocating today, which would apply to two automobile accidents occurring on August 22, 1958,[12] and July 4, 1960,[13] respectively, and for injury sustained by stepping on a nail that occurred on May 16, 1962.[14]

My Brother does not grant the *amicus curiae* request for "extermination, root and branch, of the wayward interspousal immunity doctrine," but at the conclusion of his opinion states: "What we have said here concerning the doctrine of interspousal tort immunity must be considered in light of these same fact circumstances."

The impact of such a recommendation does not, in my opinion, appreciably lessen the impact that would have been caused by a complete extermination because: (a) It is notice to all that the immunity tort doctrine which has existed since Michigan became a State is now vulnerable to attack and that this Court can change the immunity doctrine as it sees fit; and (b) It is an announcement that this Court will consider all appeals for claimed interspousal tort injury according to the facts of each case, not only as they arise in the future, but as they have arisen in the past.

The Kent, Oakland, and Genesee circuit judges who entered the orders of dismissal properly applied the law and should not be reversed.

The orders should be affirmed. Costs to appellees.

---

[11] Laws of Illinois, 1953, p 437, § 1 (Ill Anno Stat, c 68, § 1).
[12] Mosier *v.* Carney.
[13] Smith *v.* King.
[14] Dood *v.* Mosher.

BLACK, J. (*dissenting*).

"Overruling a precedent always introduces some confusion and the necessity for it may be unfortunate. But it is as nothing to keeping on our books utterances to which we ourselves will give full faith and credit only if the outcome pleases us. I shall abide by the *Williams Case* [*Williams* v. *North Carolina,* 317 US 287 (63 S Ct 207, 87 L ed 279, 143 ALR 1273)] until it is taken off our books, and for that reason concur in the decision herein."

The words are those of Mr. Justice Jackson, written in *Magnolia Petroleum Co.* v. *Hunt,* 320 US 430, 447 (64 S Ct 208, 88 L ed 149, 150 ALR 413). I mean to apply them, along with my adherence to right or wrong *Harvey* v. *Harvey,* 239 Mich 142; *Riser* v. *Riser,* 240 Mich 402; and *Kircher* v. *Kircher,* 288 Mich 669, no matter whether this opinion turns out to be one of dissent or one of concurrence.

Benefited by firsthand experience during the past 3 to 4 years, culminating as of now with the handing down of *Currie* v. *Fiting,* 375 Mich 440, I would not even consider either the open or silential overrulement of a matured, unanimous, and long since accepted and applied judicial interpretation of a long standing statute, even though—according to my view—such interpretation was wrong from the beginning. To do so amounts simply to judicial amendment of a statute, and that is barred upon oath—by section 2 of article 3 of the 1963 Constitution—as outright usurpation of *all* lawmaking power. And the wretched iniquity of such judicial practice is that it leaves the legislature in position where it knows not what legal words and phrases are employable with dependable safety and assurance as that body goes about writing and debating statutes and amendments of statutes.

Justice Kelly, writing to affirm what was judged below for all three of these cases, has put still another finger on the lurking dangers of overrulements that are not confined within explicitly riveted words.[1] I in turn am the more convinced that any further overrulings by this Court, whether the decision or decisions to be overruled deal exclusively with the common law, or consist of sharply dissident opinions construing an unamended statute, or consist of decisions which "themselves are in turmoil and conflict" (*Sheppard* v. *Michigan National Bank,* 348 Mich 573, 602), should by express declaration be made effective for the future only, as was done in the Montana case (*Sunburst Oil and Refining Co.* v. *Great Northern R. Co.,* 91 Mont 216 [7 P2d 927]) which *Sunburst* (*Great Northern R. Co.* v. *Sunburst Oil & Refining Co.,* 287 US 358 [53 S Ct 145, 77 L ed 360, 85 ALR 254]) affirmed. At this point, again as in *Williams* v. *City of Detroit,* 364 Mich 231, 283, Cardozo's infallible wisdom is offered:

" 'The objection will be made that courts are without power to tie the hands of their successors by a declaration of purpose not wrought into a judgment. If I conceive the situation justly, they are not attempting to tie the hands of anyone. They are untying and releasing. A fair paraphrase of what they say is this: " 'The rule that we are asked to apply is out of tune with the life about us. It has been made discordant by the forces that generate a living law. We apply it to this case because the repeal might work hardship to those who have trusted to its existence. We give notice, however, that anyone trusting to it hereafter will do so at his peril.' "

---

[1] By way of conclusion of his opinion Justice Kelly has pointed out that the result proposed here by Justice Souris would become an open invitation to attacks upon immunity from tort liability in all kinds of cases, regardless of legislative action and long since settled judicial applications of such action. Surely, for a while at least, we have seen enough of such attacks—in tort cases—on mature statutes and venerably unanimous interpretations thereof.

My views supporting the principle of prospective
overrulement were written at length in *Williams*
(364 Mich 283).  That was more than four years ago.
Now, in this month of July, 1965, one need but com-
pare *Mapp* v. *Ohio,* 367 US 643 (81 S Ct 1684, 6 L ed
2d 1081, 84 ALR2d 933), with recent *Linkletter* v.
*Walker* (June 7, 1965), 381 US 618 (85 S Ct 1731,
14 L ed 2d 601), to perceive what happens inevitably
when a court of last resort, having determined to
overrule a case or cases, tries either to straddle or
decides to overrule with retrospective effect.  Four
members of this Court tried to walk astride both
sides of the thorny fence of overrulement in *Williams*
(364 Mich 250 through 270), and the Illinois supreme
court accomplished that feat—by majority vote—
in *Molitor* v. *Kaneland,* 18 Ill 2d 11 (163 NE2d 89).
For the hair shirt and linsey-woolsey pants *Molitor*
manufactured for the courts of Illinois, see the
*Williams Case* at 286 and 287; "Tom Molitor and the
Divine Right of Kings,"[2] cited and quoted in *Wil-
liams* on said pages 286 and 287, and Shepardize
*Molitor* again—in this year 1965.

These cases of Mosier, Smith, and Dood present a
duplicate of what became standoffs in *Burns* v. *Van
Laan,* 367 Mich 485 and *Halfacre* v. *Paragon Bridge
& Steel Co.,* 368 Mich 366.  In *Halfacre* a 35-year-old
statute was found by five of us as having been con-
strued and applied by the Court one way—an inde-
fensible way—on three separate, consistent, and
unanimous occasions; yet four of us found that such
construction and application was firmly rooted in
that statute.  As for the cases at bar, going back to
*Harvey's* interpretation and application in 1927 of
then and presently applicable statutory provisions
(CL 1915, §§ 12356, 12357; CL 1948, §§ 612.5, 612.6
·[Stat Ann §§ 27.657, 27.658]), which provisions and

---

[2] 37 Chicago-Kent LR 44.—Reporter.

their previous applications have so far barred all three present suits, we find that our Court long ago read such provisions, unanimously, as an intendment of the legislature that interspousal tort actions not be maintainable. In the meantime (by PA 1927, No 389 and again by PA 1943, No 242) the legislature ordained that "All general laws in force in this State" should be collected and compiled "without alteration," and directed that such compilation be duly published. That was done, and so came into being the Compiled Laws of 1929 and the Compiled Laws of 1948. Is this not specially cogent evidence, extending over the years since the respective compilations of 1929 and 1948, of calculated legislative acceptance of said sections 612.5 and 612.6, as those sections were viewed and applied by and since the date *Harvey* was handed down?

The above is not the only record evidence of implied legislative approval of this Court's interpretation and application—of the cited two sections—as made in *Harvey, Riser,* and *Kircher.* Bearing always in mind that the instant rights of action arose —if they arose at all—prior to the effective date of the revised judicature act (CLS 1961, § 600.9911 [Stat Ann 1962 Rev § 27A.9911]), we find that the cited two sections remained unamended until they were expressly repealed by that act (CLS 1961, § 600.9901 [Stat Ann 1962 Rev § 27A.9901]). By the same act the following new section came into being (CLS 1961, § 600.2001 [Stat Ann 1962 Rev § 27A-.2001]):

"Actions may be brought by and against a married woman as if she were unmarried.";

and *the accrued right* of defendants Carney, King, and Mosher, to defend these suits, on strength of interpreted and applied sections 612.5 and 612.6, was expressly preserved. For such express preserva-

tion, see CLS 1961, § 600.9905 (Stat Ann 1962 Rev § 27A.9905).

The assembled evidence of legislative acquiescence in, and of affirmative legislative acceptance of, the construction which had been placed on said sections 612.5 and 612.6 during the 1920's and 1930's is quite as strong as that which was recounted in *Halfacre*. It is stronger, in one respect. The error of the three earlier decisions considered in the *Halfacre Case* (*Boshaw, Blanton,* and *Walker*),[3] cited in that case at 382, was so gross that no one attempted seriously to defend it. Yet four of us found that the legislature had long since acquiesced in and had accepted such construction and application.

It is immaterial now that *Harvey, Riser,* and *Kircher* may have been wrong. That is sharply debatable considering "the present ambivalence of thought upon this question," which ambivalence Justice SOURIS has so ably examined in his brief for reversal. What is important is the sanctity of the legislative process and the fact of years of acceptance, by the legislature, of what by *Harvey, Riser,* and *Kircher* became—years ago—an integral part of said sections 612.5 and 612.6.

One may agree, upon strength of Justice SOURIS' well reasoned 1965 view of these old statutory provisions distinguished from judicial view thereof as taken in 1927 (and again in 1939), that this statutory bar—as found by the Court in *Harvey, Riser,* and *Kircher*—of interspousal suits for tort has become both unreasonable and outmoded. The legislature may—I say "may"—have come to just that conclusion in 1961 when it repealed such provisions and enacted said section 2001 (CLS 1961, § 600.2001 [Stat Ann 1962 Rev § 27A.2001]). But again, as pointed

---

[3] *Boshaw v. J. J. Newberry Co.,* 259 Mich 333 (83 ALR 412); *Blanton v. Clay Products Company,* 310 Mich 635; *Walker v. Ridley Cleaners, Inc.,* 311 Mich 4.—REPORTER.

out solo by the writer in *Currie* v. *Fiting*, 375 Mich beginning at 458, and approved *Per Curiam* a month later in *Husted* v. *Consumers Power Co.*, 376 Mich 41, 54, "legislative intent is determinable properly by what was at the time of enactment, rather than what might appear a half century later—by hindsight" (citing *Wayne County Road Com'rs* v. *Wayne County Clerk*, 293 Mich 229, 235; *Platt* v. *Union Pacific R. Co.*, 99 US 48, 63, 64 [25 L ed 424]; 50 Am Jur, Statutes, § 236, p 224).

The statutory provisions scrutinized here remained until 1963 as enacted in 1915. Could Justice Souris, had he been a member of the Court when Justice Wiest wrote *Harvey*, have made the same arguments for liability as are now made by him? No one, I trow, will answer affirmatively. Today's facts just weren't present at that time for scrivening. Better to say that the new provision of 1915 as advanced in *Harvey* by attorney Howard L. Campbell was legislatively intended, in 1915, to provide proper ground for distinguishment of 1898 *Bandfield*.[4] The provision read then, as it read when all three of these causes allegedly arose:

"Whenever a cause of action shall accrue to, or arise against any married woman, she may sue or be sued in the same manner as if she were sole." (CL 1915, § 12357.)[5]

I have separate as well as concurrent thoughts for the action which, by express allegation, was brought by administrator Mosier pursuant to and on the exclusive authority of section 1 of Michigan's wrongful death statute (CL 1948, § 691.581).[6] For

---

4 *Bandfield* v. *Bandfield*, 117 Mich 80 (40 LRA 757, 72 Am St Rep 550).—Reporter.

5 CL 1948, § 612.6 (Stat Ann § 27.658).—Reporter.

6 Paragraph 3 of administrator Mosier's declaration reads:

"Plaintiff brings this action pursuant to CL 1948, § 691.581 (Stat Ann § 27.711) commonly known as 'the death act.'"

more than a century that section has conditioned the
special cause of action created thereby upon right
of the decedent to sue and recover damages as
against the wrongdoer "if death had not ensued."
By said section 1 Mr. Carney was not "liable," and
now is not liable, unless suit by Mrs. Carney could
have been maintained against her husband had she
survived.   The statute has said so ever since 1848
(No 38) and says so today.   I am reasonably sure
that every Justice seated here knows that.   So in
order to reverse Judge Parker's dismissal of admin-
istrator Mosier's suit this Court must amend said
sections 612.5 and 612.6, *nunc pro tunc* as of August
21, 1958 (the date Mrs. Carney was fatally injured),
to provide that the two sections mean something
other than what they have continuously meant, on
the legislative and judicial record, between the date
*Harvey* was handed down in 1927 and the effective
date of repeal, by the legislature, of said sections
612.5 and 612.6.[7]

As written in *Currie* v. *Fiting, supra,* I oppose
judicial amendment of statutes.   And the *nunc pro
tunc* amendment of said sections 612.5 and 612.6,
made now in order that the Court may reverse two
of the three judgments below, is just too much of a
power intoxicant for swig by this more delicately
ordered member of the Court.   Nearly seven years of
retroactive effect like that, made for the special bene-
fit of two plaintiffs at bar, spells invidious discrimi-
nation; a subject that was given more than passing
attention by one of us in *Williams,* 364 Mich at 290.

## Conclusion.

This Court's error, if error there was in unani-
mous *Harvey, Riser,* and *Kircher,* has been ac-

---

[7] The effective date of such repeal was January 1, 1963 (CLS 1961,
§ 600.9911 [Stat Ann 1962 Rev § 27A.9911]).

quiescently accepted by the legislature. That makes
said sections 612.5 and 612.6 mean for all plaintiffs
at bar what they meant for plaintiffs Harvey, Riser,
and Kircher; likewise what those sections meant to
the legislature during all the years between June 6,
1927 (the date *Harvey* was handed down) and Janu-
ary 1, 1963 (the date of effect of the revised judica-
ture act [CLS 1961, § 600.9911 (Stat Ann 1962 Rev
§ 27A.9911)]). The Court's solemn word was given
to the profession by *Harvey, Riser,* and *Kircher.*
Trustingly relied upon, now it is sullied.

It is not so much what the legislature enacted,
prior to release of *Harvey, Riser,* and *Kircher,* that
counts now in the judicial process. What really
should control us is that which the Court told the
legislature said sections 612.5 and 612.6 meant;
followed by 34 years of legislative concurrence
therewith. The legislature, supposedly in exclusive
charge of the policies of our State and of enacting
and amending laws best suited to those policies,
refrained steadily from changing the two sections
until after all three torts as presently alleged had
been committed. That fact calls for affirmance of
the respective judgments as entered below.

Dissenting in *Mahnich* v. *Southern S. S. Co.,* 321
US 96, 113 (64 S Ct 455, 88 L ed 561), Mr. Justice
Roberts wrote an appropriate as well as prescient
conclusion for views as expressed above; a conclu-
sion which—now—finds ample support in ink-fresh
*Linkletter* v. *Walker, supra:*

"Of course the law may grow to meet changing con-
ditions. I do not advocate slavish adherence to au-
thority where new conditions require new rules of
conduct. But this is not such a case. The tendency
to disregard precedents in the decision of cases like
the present has become so strong in this court of late
as, in my view, to shake confidence in the consistency
of decision and leave the courts below on an un-

charted sea of doubt and difficulty without any confidence that what was said yesterday will hold good tomorrow, unless indeed a modern instance grows into a custom of members of this court to make public announcement of a change of views and to indicate that they will change their votes on the same question when another case comes before the court. This might, to some extent, obviate the predicament in which the lower courts, the bar, and the public find themselves."

My considered opinion is that the 1963 Constitution of Michigan (art 3, § 2) requires that this Court refrain from legislating responsibility for tort liability as alleged against defendant Carney in No. 50142, and against the defendants in Nos. 50360 and 50410. I therefore vote to affirm, without an award of costs.

*Supplement* (November 12, 1965):

The internal history of these cases, catalogued by date and event from the beginning of our consideration to the writing of this supplement, will describe pretty well the tenterhooked position into which present opinions will thrust the profession and the subordinate court judges of Michigan. Now for that history.

These cases came to final submission January 7, 1965. Justice SOURIS submitted his foregoing opinion for reversal February 24, 1965. Justice KELLY wrote as above to affirm June 17, 1965. My opinion for affirmance, above, was turned in July 2, 1965. Justice SMITH wrote to *affirm* July 13, 1965. That day the Court signed opinions which resulted in affirmance by an equal division of the Court. Only the automatic effect of an intra-Court resolution, passed during the previous month to arrest opinions resulting in a tie vote, prevented delivery of the four signed opinions to the clerk's office.

Justice Smith, advising October 1st that "I find that I am no longer in agreement with my former position," wrote to *reverse*. His present opinion, summed up, arrives at this position of certain uncertainty:

"In its broad sweep, the reasoning in Justice Souris' opinion goes well beyond the necessities of the 3 cases. Although in some situations, this may be good judicial craftsmanship, I doubt its value in this kind of gate-opening decision. In this situation, it has the effect of a broad 'come-one, come-all' invitation. The opinion will likely be construed as erasing, in the ultimate analysis, interspousal immunity in every conceivable type of tort case, from the grossest intentional tort down to the chronic irritants present in many marriages. I wish it to be understood, then, that in concurring in the holding of Justice Souris' opinion, I am not voting for the abolition of all interspousal tort immunity in Michigan, but for the specific result in the cases before us."

Turning now to Justice O'Hara. He has written for these cases, under date of October 18, 1965:

"I am not prepared to abrogate judicially all interspousal tort immunity. I agree with Mr. Justice Kelly's expressed view that this whole sensitive area would be better left to legislative determination. However, the question is now presented for judicial determination and I do not feel I may rest upon legislative inaction because of a basic social change that has eventuated since the doctrine evolved in our State."

Even the devil, having determined to move in on the courts of Michigan for the purpose of stimulation and maintenance of honest or dishonest litigation between members of a family, could do no better job than that which is due to sprout from the sum of our opinions *quinque*. The Court, having determined to reverse for reasons a majority of the Justices will

not indorse, is committed to the flood, out of which
it cannot swim.  If by majority action the Court is
ready to repudiate, just for some of the cases at bar,
*Riser's* mature interpretation and application of
present sections 612.5 and 612.6 (CL 1948) and, at the
same time, is ready to enact a retrospectively effec-
tive amendment of section 1 of the wrongful death
statute (CL 1948, § 691.581) so as to make the defend-
ant Carney "liable to an action for damages," for
which damages he simply did not become "liable"
August 21, 1958 for want of right of his fatally in-
jured wife to "maintain an action and recover dam-
ages in respect thereof" as against him, then unfore-
seen "extensions" of such judicial action, involving
mainly the common law, are due surely to confront
us.  Examples will presently appear.

But first let us consider Justice SOURIS' declaration
of picked and chosen devotion to the recently an-
nounced views of the Minnesota supreme court,
found by him in *Shumway* v. *Nelson,* 259 Minn 319
(107 NW2d 531), and *Poepping* v. *Lindemann,* 268
Minn 30 (127 NW2d 512).  Whatever one may think
of those views, opposed as they are by the clear
weight of authority and the even more recent deci-
sions in *Saunders* v. *Hill,* — Del — (202 A2d 807),
and *Jones* v. *Pledger* (DC DC), 238 F Supp 638, one
thing stands forth.  It is that section 1 of our wrong-
ful death act is a true Lord Campbell's act[8] (see
quotation of that act in *Hyatt* v. *Adams,* 16 Mich 180,
193) ; whereas by direct concession of the Minnesota
court the wrongful death statute of that State is
distinctively different ("because of the particular
language of our death-by-wrongful-act statute and
the construction placed upon it, they [authorities
from other jurisdictions] are of but limited assist-
ance").[9]

---

[8] See 17 Halsbury's Statutes of England (2d ed), p 4.—REPORTER.
[9] The quotation is from the *Shumway Case,* p 323.

From the very beginning, 117 years ago, section 1 of our statute has provided a specific of unmistakably worded precision, that is, *liability* of the actor *provided the wrongful act alleged against him* "*is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages, in respect thereof.*" There is a quasi-legal presumption that everyone seated here can read simple English; also that he knows Mrs. Carney could have *maintained* no action against her husband and could have *recovered* of and from him no damages on account of the wrongful acts alleged by the plaintiff administrator. Her husband wasn't *liable* to her before she expired in 1958; therefore under the statute he isn't *liable* to her administrator. If Mr. Carney is to be made *liable* as claimed, such *liability* will have to be created by judicial amendment of a statute; an amendment the Court—acting *nunc pro tunc* with a vengeance—must make effective as of more than seven years ago.

In the cited Delaware case the court said all that need be said further (202 A2d 807, 810):

"Plaintiff has been unable to show any express language in the wrongful death statute which indicates a legislative intention to abrogate the common-law rule of immunity from suit. In fact, the statute supports the opposite conclusion, since the statute presupposes the ability of the decedent to have brought a personal injury action had he lived. We, therefore, are of the opinion that the wrongful death statute does not create an exception to the normal immunity from suit between husband and wife. If a change is to be effected in the well-settled public policy of this State, such change must be effected by the legislature and not by this court."

The aforesaid events of 1965 evidence the more an accelerated pace of our new majority toward insou-

ciant and wholly unconstitutional statutory amendments, all *ex post facto*. Consider this:

Six months ago Justice O'HARA, writing in the *Currie Case* (375 Mich 440, 456, 457), found that the legislature had "acquiesced" in a rule of damages found by him in *Wycko's* majority opinion (361 Mich 331) and, consequently, that that opinion (then and now wrong in his view)[10] must be followed. *Wycko,* when *Currie* was handed down, was less than five years old. That makes less than five years of legislative "acquiescence" in one—just one—*not exactly unanimous decision.* With that, compare what is before us. Thirty-eight years ago the Supreme Court of Michigan decided, *unanimously,* that a presently applicable statute forbade interspousal suits for tort (*Harvey,* 239 Mich 142). Twice thereafter, the Court being *unanimous* on each occasion, such forbiddance was reaffirmed (*Riser,* 240 Mich 402; *Kircher,* 288 Mich 669).

Turn now to what Justice O'HARA said about our subject: "The sword of presumptive legislative notice of judicial decisions cuts both ways." (*Currie* at 456.) It is significant, I respectfully suggest, that my Brother abstains from present wield of his metaphorical sword. It must be a saber, not a claymore, since it does not cut both ways. Now we see that it cuts only when a judicial pronouncement of legislative acquiescence favors a *plaintiff* in tort; not a *defendant.* Thus was the doctrine of legislative acquiescence right for *Currie,* and thus is it shunned now like leprosy.

---

[10] Hardly two months ago Justice O'HARA, manifestly disturbed as he continued to behold *Wycko,* wrote this for *Wilson* v. *Modern Mobile Homes,* 376 Mich 342, 355:

"I can find no error in the charge, but I write separately to indicate my agreement, that *Wycko* be reconsidered as suggested by Mr. Justice KELLY and Mr. Justice BLACK. *My concurrence in the application of the extant rule was based upon the principle of legislative acquiescence.*" (Emphasis supplied by present writer.)

· Once, when this Court was called upon to interpret ·
and apply a statute, the Justices sought to ascertain
*the intention of the legislature* with respect to the
specific problem at hand.    Here, though, not one of
the Brethren writing for reversal is willing to an-
nounce a finding—take section 1 of the wrongful
death statute for illustration—that the legislature
when it met in 1848, or the legislature when it met in
1871, or the legislature when it met in 1939, intended
by the enactment and re-enactment of said section 1
to make the defendant "liable to an action for dam-
ages" regardless of whether that defendant's "act,
neglect or default" is or is not such "as would (if
death had not ensued) have entitled the party injured
to maintain an action and recover damages."    In
these curious circumstances no one can deny that the
plain duty of ascertainment of the applicable legisla-
tive purpose, as of enactment time (*Husted* v. *Con-
sumers Power Company,* 376 Mich 41; syllabus 9),
has been nonchalantly renounced.    We are told in-
stead that section 1 has become outmoded by the
intervention of new conditions; hence that it should
be applied according to such new conditions rather
than in accordance with the enacting and re-enacting
intent of 1848, 1871, and 1939.    Behold the retro-
active amendment, *by judicial order,* of a century-old
statutory provision.

Where will our current opinions leave members of
the profession, and the clients they must advise?
The answer has to be—with quicksand law only for
the deluge of intra-family litigation that is sure to
follow.    By what Justice Smith refers to as "this
kind of gate-opening decision," have we not issued
coy suggestion that suit by Reggie against duly in-
sured father, the latter having backed over Reggie's ·
father-gifted new motor scooter, will now be enter-
tained (*Elias* v. *Collins,* 237 Mich 175 notwithstand-

ing)? May not mother hold Reggie, Reggie being legatee of grandpa's fortune, damage-responsible for that sagging sacroiliac suffered when, bedecked and late for the PTA, mother has sallied forth only to step on Reggie's carelessly deposited skateboard (see the established rule of the common law, annotated in 60 ALR2d at 1284)? What will the litigatory result be should Reggie (endowed as above and being more than 7 years old; *Queen Insurance Company* v. *Hammond,* 374 Mich 655) carelessly set fire to and destroy the family home, the home being partly insured only and father having been grievously hurt by an ungraceful escape through one of the second story windows? Will not the Court ultimately be pressured into holding father liable to mother, for some real or colluded tort resulting in an injury sustained within or about the home, father being the owner and carrying what is called "comprehensive coverage" thereon?

This Court's primary duty is that of reporting precedentially, for the guidance of her people, the common law of Michigan, and of ascertaining precedentially, for the same informative purpose, the legislatively intended meanings of laws enacted by the legislative branch. Now, though, having strayed from these duties, the newly arrayed overrulers of the Court will have no way to control the Frankenstein they are about to turn loose. No judge dare say that this new rule of intra-family liability shall be limited as to recoverable amount by the maximal amount of liability insurance the defendant member may carry. No judge can write, into such newly created right of action, a proviso such as appears in the New York statute to which Justice KELLY has referred, *ante,* p 585, that is, "no insurance, no recovery." Sadly though, when they have sufficient votes here, members of this Court can force the whole

profession to wander with them through Stygian
legal darkness, with an unpredictable golem at large,
until the personnel of the Court has come again
to decisive change.

To attain its righteous goals the wholesome liberal-
ism of the law must be sipped and savored with the
salutary care of progressive moderation.    When
gulped and guzzled in quantity, however, legal lib-
eralism quickly becomes a habit-forming intoxicant,
driving some hitherto respected juristic minds to
more and more extensional excesses until there is no
cure.    With nothing left but the doubtful value of
estimation by lawyers of the prospective condition of
judicial satiation and surfeit with overrulings, there
now is no reliable law in the peninsular State.    No
statute, however mature, well understood and con-
tinuously applied, is immune from new and novel
"interpretation," or even from outright amendment
by judicial order guised as an act of overrulement.[11]
No unanimous decision involving some long stand-
ing statute, even though handed down by the Cooley
Court, is safe from casual repudiation.    Indeed, this
year's frightening record of more and more motions
by Justices (a) to overrule unanimous decisions of
the Court, made by men of renowned superior com-
petence once seated here, or (b) to amend, by judi-
cial act, long standing statutes by simply rewriting
them so they accord with majority desire, or (c)
simply to take over a part of the legislative process
from time to time on plea that the legislature is just
too busy to legislate fully and effectively,[12] proves

[11] Looking back over the intervening months since Justice Adams
joined others at the helm, *People* v. *Holbrook*, 373 Mich 94, stands
forth as precursive of this Court's present hard-aport course toward
the shoals of lost public confidence.

[12] Such plea comes most recently from the brilliant address of
Harvard Professor Robert E. Keeton, delivered during the annual
conference of Chief Justices at Miami Beach this past summer.
Dwelling upon the subtopic "Increasing institutional limitations upon
the potentiality of legislatures for reforming law," Professor Keeton

that portsided liberalism is making a runaway train of the Supreme Court of Michigan with the law's "quest for certainty" long since cast aside.

Americans are still being taught that everyone is presumed to know the law; that ignorance of the law will never be listened to as an excuse in the courts of the land. All lawyers and judges too, as I presume, have received like training. But what are citizens standing at the bar of justice, and the counsel representing them respectively, to do when there is no way to ascertain the law for personal or professional guidance except surmise and conject what a bare majority of this appellate court, swinging as it does today like Chaucer's wedercok,[13] later on will say it is? Slowly, by force of all these motions to meddle judicially with dislikable statutes, we are forging over the outer door of this Court a warning much like that which Dickens depicted in Bleak House (Heritage edition, ch 1, p 17):

"This is the court of chancery; * * * which so exhausts finances, patience, courage, hope; so overthrows the brain and breaks the heart; that there is not an honourable man among its practitioners who would not give—who does not often give—the warn-

takes studied position that State legislatures are no longer able to perform—fully that is—the task which by constitution is assigned to them; that, therefore, the courts should pick up and perform the legislative slack.

Whatever one may think generally of this intriguing idea, I suggest it is not for Michigan. With our touted new "full-time and fully paid legislature," can there be any excuse for application here of such doctrinism? How in any event may this Court apply it and yet avoid evasion of Michigan's 130-year-old mandate to maintain due separation of her tripartite branches? See Justice COOLEY's grim reminder in People, ex rel. Sutherland, v. Governor, 29 Mich 320; also section 2 of article 3 of the present Constitution of Michigan.

Copies of Professor Keeton's address were delivered to our membership, in the company of glowing comment by Chief Justice KAVANAGH, immediately following the Miami Beach conference.

[13] Robinson, Poems of Chaucer (Cambridge ed), Against Women Unconstant, p 676.—REPORTER.

ing, '*suffer any wrong that can be done you, rather than come here!*' "

The only hope today is that Michigan's new insulator between her trial courts and this Court, the Court of Appeals that is, will for a time buffer the ominous portents of all these 1965 acts of legislation by the judicial branch. After all, the judges of subordinate courts are sworn to follow our *mature* and *settled* decisions as they stand, not to guess whether and which ones this Court will reject or accept, and time begets sanguinary trust that our errantly headstrong will sooner or later perceive the effect of what they have done, in 1965, to that great precept, equal justice under law. Nothing, absolutely nothing, is more vital to continuity of America's constitutionally continuant experiment of government by law than the stability and, therefore, the common understanding of the law as written; the law all citizens are required to observe, learn, respect and conform to.

It is a pity that appellate court judges, detached as they become from the evidentiary realities of our trial courts, do not listen more to experienced trial lawyers and trial judges. While we deliberated upon these long pending cases Circuit Judge David Anderson delivered a sobering as well as painstaking address, titled "Interspousal Immunity," before the annual meeting of the State Bar Negligence Section, convened at Mackinac Island May 30, 31, 1965.[14] Judge Anderson's worthy-of-thought conclusion was this:

"The necessity for developing and imposing restrictions is recognized by the advocates of interspousal liability. But the development of such restrictions by judicial decision is a long and time consuming process. It appears to me—and if you

[14] State Bar of Michigan, Negligence Section Bulletin, No 88, Sept. 24, 1965, pp 25, 32.—Reporter.

want to go home and tell someone what my talk was about, this is it—it appears to me that the conclusion is inescapable that if change is to come in this field it must and should come through legislative enactment. Here, at one time, the public policy of the State could be determined by the body supposedly vested with the power and duty to so determine it, and the necessary conditions and restrictions could be imposed."

With requisite deference, I suggest that if today's majority is hotspurred toward overruling *Harvey, Riser,* and *Kircher,* its act of overrulement should be effected in such way as to avoid a most unfair letdown of those who are taught to obey and apply law as it stands written, and to advise their clients according to law thus written. The unconditional word of the Court was pledged on the record by *Harvey, Riser,* and *Kircher.* Did not counsel for the defendants Carney and King rightly rely upon *Harvey, Riser,* and *Kircher,* back in 1961 and 1962 when Mr. Carney and Mrs. King were sued? Did they not rightly rely, later when these appeals were taken, on the same three cases? This Court should make good its own representations, just as it forcefully imputes to nonjudicial representers the intention of making good what by representation they have induced.

Refer to section 234 of the new text of American Jurisprudence (20 Am Jur 2d, Courts, pp 562, 563). The complete section follows:

"Sec. 234—*Change in construction of statute*

"The overruling of a judicial construction of a statute will not be given retroactive effect. Such a decision will be limited to the effect ordinarily inherent in a legislative change of a statutory rule, that is, merely prospective effect. This principle has been applied, for example, to a change, by reversal of prior decisions, in the judicial construction of a statute of descent."

Even Professor Keeton, previously quoted, stands for this worthy view. It is developing swiftly out of necessity as well as fairness. See *Linkletter* v. *Walker* (handed down by the Supreme Court June 7, 1965), cited *supra* at page 589.

Professor Keeton said (same talk at Miami Beach):

"The notion that judges are engaged in merely finding law rather than making it is now thoroughly discredited. But, to paraphrase a familiar observation about another dead letter of the law, this discredited notion still rules us from its grave. Surely it is largely responsible for persistence of the view that decisional law must be applied retroactively and not prospectively alone. Why else should courts deny themselves the power to give effect to the elemental principle of justice that, absent compelling countervailing interests, notice should be given before a change in law becomes effective? * * *

"The point is well established, then, that use of measures of prospective judicial law-making is within our legal tradition. Prospective overruling of decisional law is not a departure from the traditional functions of courts, but at most a newly prominent perspective on a function courts have been performing since the dawn of the common-law tradition."

O'HARA, J. (*dissenting in part*). I am not prepared to abrogate judicially all interspousal tort immunity. I agree with Mr. Justice KELLY's expressed view that this whole sensitive area would be better left to legislative determination. However, the question is now presented for judicial determination and I do not feel I may rest upon legislative inaction because of a basic social change that has eventuated since the doctrine evolved in our State.

That change is the grave potential for interspousal injury arising out of the almost universal family ownership of a motor vehicle. The nature of the tort

arising from its negligent operation is to me different in nature from all other interspousal redressable injury. It is peculiarly impersonal and may almost be said to be an occupational hazard of living in our present-day society. I therefore agree with Mr. Justice SOURIS: that a suit may be maintained, predicated upon injuries to one spouse during marriage arising out of an alleged wrongful act of the marital partner when the allegedly wrongful act resulted in the termination of the marriage by death, but only when the wrongful act alleged is the negligent operation of a motor vehicle. I join in his order of remand for further proceedings in Mosier v. Carney and in Smith v. King.

I have not disregarded Mr. Justice BLACK's trenchant argument that in the case of Administrator Mosier, Mr. Carney could not be liable because Mrs. Carney could not have asserted her cause of action "if death had not ensued."* True, but in my view, this was a bar to asserting the cause of action peculiar to her as his wife and not to the accrual of the cause of action itself. The retrospective character of the overruling is disputatious but as recently as *Linkletter* v. *Walker,* 381 US 618, 622–629 (85 S Ct 1731, 14 L ed 2d 601) the United States Supreme Court took the basic position, as I understand it, that courts must weigh the merits and demerits of this question in each individual case. In this case, I believe, as I did in *Myers* v. *Genesee County Auditor,* 375 Mich 1, that the overruling should be as to these cases and to pending and future cases. See, also, *Bricker* v. *Green,* 313 Mich 218, 236 (163 ALR 697).

As to Dood v. Mosher, I vote to affirm the order of the trial court. I, also, would award no costs.

---

* See CL 1948, § 691.581 (Stat Ann 1959 Cum Supp § 27.711).— REPORTER.